**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **WAL-MART STORES, INC., et al.** | § | |
| | § | |
| v. | § | A-15-CV-134-RP |
| | § | |
| **TEXAS ALCOHOLIC BEVERAGE** | § | |
| **COMMISSION, et al.** | § | |

## ORDER

Before the Court are the following motions and their associated responses and replies:

(1)  Twin Liquors's Motion to Quash and for Protection from Deposition Subpoenas to Non-Parties Twin Liquors LP and David Jabour and Motion for Declassification of Plaintiffs' Expert Reports (Dkt. No. 95);

(2)  Intervenor Texas Package Stores Association's Motion to Modify Deposition Subpoena (Dkt. No. 96);

(3)  Spec's Family Partners's Motion to Quash Some Deposition Topics (Dkt. No. 105); and

(4)  Plaintiffs' Motion to Compel The Texas Package Stores Association and Twin Liquors, LP to Produce Documents (Dkt. No. 123).

The District Court referred the above-motions to the undersigned Magistrate Judge for resolution pursuant to 28 U.S.C. §636(b)(1)(A), FED. R. CIV. P. 72, and Rule 1(c) of Appendix C of the Local Rules.

The Court held a hearing on the motions on April 14, 2016.  Shortly after the hearing, the TPSA moved for a stay of the proceedings pending its interlocutory appeal of the denial of its motion to intervene.  The Fifth Circuit granted that motion to stay on May 4, 2016.  Dkt. No. 136.  On September 9, 2016, the Fifth Circuit issued its order reversing the denial of TPSA's motion to intervene, Dkt. No. 140, and Judge Pitman lifted the stay on September 13, 2016, Dkt. No. 142

## I.  BACKGROUND

Plaintiffs challenge the constitutionality of TEX. ALCO. BEV. CODE §§ 22.04, 22.05, 22.06, and 22.16, contending that the statutes violate both the Equal Protection Clause and the Dormant Commerce Clause.  The statutes regulate grants of permits to make retail sales of distilled spirits by limiting the number of permits a person may own and the types of companies which may own them. Plaintiffs argue that the ban on public corporations, as well as the consanguinity consolidation provision of the statutes unconstitutionally discriminate against out-of-state companies in both effect and purpose.

Movants—Spec's Family Partners, Ltd., Texas Package Stores Association, Twin Liquors, LP, and David Jabour—object to a number of Rule 30(b)(6) deposition topics and requests for production.  TPSA is an intervenor in the case, but all other Movants are non-parties to the suit. In April, Movants filed motions to quash the deposition topics, and the Court heard arguments on those motions.  Immediately prior to the hearing, Wal-Mart filed a motion to compel the production of documents from both TPSA and Twin Liquors.  Because the arguments against production are nearly identical to those challenging the deposition topics, the Court did not hold an additional hearing to address the document requests.

In brief, the disputed discovery topics seek five categories of communications from each of the Movants to "any Texas government body," which is defined to include the Texas legislature, any members of the Texas legislature, legislative staff members, the Attorney General, the Governor's office, and the Texas Alcoholic Beverage Commission ("TABC"). The communications Wal-Mart seeks to discover are any communications from 1994 to the present between Movants and state actors about:

- TEX. ALCO. BEV. CODE § 22.16 (the ban on public corporations holding permits);
- efforts to repeal any of the challenged statutes;
- this litigation;
- the decisions in *Cooper v. McBeath*, 11 F.3d 547 (5th Cir. 1994), and *Siesta Village Market v. Perry*, 530 F. Supp. 2d 848 (N.D. Tex. 2008); and
- the sale of distilled spirits by public corporations.

In addition to these five categories of communications, Wal-Mart also seeks records of campaign contributions to any Texas legislator, and communications between Movants and just the TABC regarding TEX. ALCO. BEV. CODE § 22.05 (the "consanguinity consolidation procedure").[1] Movants argue that communications on these topics are irrelevant to Plaintiffs' claims and are privileged under the First Amendment. Spec's also contends that these areas are protected from discovery by TEX. GOV'T CODE § 306.004.

## II. ANALYSIS

The Movants make very similar arguments in support of their objections to the discovery sought by Wal-Mart, and the Court thus considers all of the arguments together.

### A. Relevance

All of the Movants contend that their communications with legislators have no relevance to the claims brought by Wal-Mart. First, they argue that any communication after the last of the challenged statutes was adopted is irrelevant, as anything past that time could not possibly be probative of the legislature's motives in adopting the laws. Next, they contend that only public, on-the-record statements of legislators are relevant to show motive, and thus "private" lobbying conversations with legislators are irrelevant.

---

[1] Initially the TPSA also challenged Wal-Mart's entitlement to discovering TPSA's top ten donors, and its list of members. Wal-Mart has since withdrawn those requests and they are no longer at issue.

A party may discover "any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b). Discovery outside of this scope is not permitted. *Id.* at (b)(2)(C)(iii). Information "need not be admissible in evidence to be discoverable." *Id.* at (b)(1). Further, the recent amendments to Rule 26 require that discovery be:

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.* As the Court noted at the outset of the hearing, the sheer number of attorneys who have made appearances in the case (24 by the Court's count) is a persuasive demonstration of the importance of the issues at stake here, the value of the case, and that the parties have significant resources available to them. Proportionality is thus not at issue in this discovery dispute.

The first step in resolving the relevance objection is identifying the evidence that is potentially admissible on Wal-Mart's two claims. First, Wal-Mart makes an equal protection claim. "The equal protection clause essentially requires that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 472 U.S. 432, 439 (1985). To prove an equal protection violation, the plaintiff must first demonstrate he has been "classified" in some way by the state. *Mahone v. Addicks Util. Dist. Of Harris Cnty.*, 836 F.2d 921, 933 (5th Cir. 1988). When—as here—the plaintiff does not allege that the classification infringes on a fundamental right, the court applies a rational basis review to the classification. *Hines v. Alldredge*, 783 F.3d 197, 203 (5th Cir. 2015). This means that the court looks at two additional issues: (1) the purpose the classification is designed to serve, and (2) the "fit" between the classification and purpose, namely "whether the state could rationally determine that by distinguishing among persons as it has, the state could

accomplish its legitimate purpose.*"* *Mahone*, 836 F.2d at 933. Or, to put it differently, whether "there is any conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications*, 508 U.S. 307, 313 (1993).

While an equal protection analysis must focus on whether *any* legitimate interest has a rational relationship to the legislation, *Mahone*, 836 F.2d at 934, "a hypothetical rationale, even post hoc, cannot be fantasy." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). Thus, in reviewing equal protection challenges to a statute, the Fifth Circuit "turn[s] to the [state's] proffered rational bases for the challenged law. Our analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts." *Id.* The court thus examines "the [state's] rationale informed by the setting and history of the challenged rule," *id.*, which can include the "factual backdrop" of the legislation. *Mahone*, 836 F.2d at 937.

Wal-Mart's second claim is brought under the "dormant" Commerce Clause. That clause is a "substantive restriction on permissible state regulation of interstate commerce." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991). Analyzing a dormant Commerce Clause claim has two parts. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). First, a court must determine whether the challenged statute "discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). If so, the court asks whether "the state 'can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *Id.* Wal-Mart contends that the statutes at issue have both a discriminatory purpose and a discriminatory effect. There are four factors that courts have found relevant in determining discriminatory purpose:

> (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.

*Id.* To show discriminatory effect, a plaintiff must show that the statute "discriminates between similarly situated in-state and out-of-state interests." *Id.* at 163. This effect can be shown if the statute "prohibit[s] the flow of interstate [services], place[s] additional costs upon them, or distinguish[es] between in-state and out-of-state companies in the retail market." *Id.* (quoting *Exxon Corp. v. Maryland*, 437 U.S. 117, 126 (1978)).

The Movants contend that any communications they had with legislators after June 12, 1995 (the date the most recent statute was adopted) are irrelevant, and thus not discoverable. As the TPSA puts it, "[t]here is no such thing as a challenge to the constitutionality of *not* amending or repealing a statute." Dkt. No. 96 at 4. Wal-Mart disagrees, and argues that the legislative process related to the repeal efforts is likely to include statements by the TPSA and its members, as well as members of the Legislature, regarding the purposes and effects of the statutes targeted by those repeal efforts—the very same statutes at issue in this case.

The Court is not writing on a completely blank slate on this issue. In denying the state defendants' motion to dismiss, Judge Pitman explicitly relied on statements surrounding the 2009 and 2013 repeal efforts as some evidence in support of Wal-Mart's claims. Dkt. No. 25 at 14. This is not surprising, given that one of the statements Wal-Mart points to from those repeal efforts (made by David Jabour, President of Twin Liquors, and representative of the TPSA at the time) plainly offers some evidence of the effects (if not the purpose) of the five store limit:

6

> Texas has approximately 2,300 liquor stores, all of which are owned by Texas residents. The reason for this 100 percent Texas ownership is the five store limit and the consanguinity exception, and a third law that prohibits the ownership of liquor stores by large corporations. . . . The public policy reason for these Texas preference laws is to foster homegrown, family-owned businesses whose income stays in Texas and is circulated in the local community. Our Texas preference laws are not unusual. Many other states also have laws that are designed to protect domestic liquor stores.

Dkt. No. 68 at 9. Given this was a statement offered at a public hearing before the Legislature, it is reasonable to assume that there were many other similar—perhaps more direct—statements made in less public settings. The Court therefore overrules the Movants' objections to discovery after 1995.

The Movants also object that even if post-1995 comments are discoverable, their private communications with legislators are not, as neither their statements, nor those of a legislator, in a private conversation can be relevant to determining the purpose or effect of the challenged statutes. Instead, they contend, only official, on-the-record statements of legislators can be considered by a court to determine the purposes of a statute.

Movants rely heavily on a single unreported decision from Florida for this argument. *See Alliance of Automobile Manufacturers v. Jones*, 2013 WL 4838764 (N.D. Fla. Sept. 11, 2013). In that case, a national auto manufacturers trade association challenged the constitutionality of a Florida statute regulating how the manufacturers paid automotive dealers for repairs. The discovery at issue in the decision was served by the manufacturer's trade association on an association of Florida auto dealers, and sought communications between the Florida association and legislators related to the challenged legislation. (Like the TPSA, the Florida dealers association was an intervenor in the case.) In sustaining the First Amendment objections of the Florida dealers association, the court opined that "[i]nformation which helps form legislative opinion will be relevant to a statute's

7

purpose and intent, but such information is gleaned from legislative history as available through the public records of the State of Florida." *Id.* at *4. Going further, the court stated that "[w]hile the Supreme Court permits courts to probe beyond assertions of legislative purpose in determining the 'actual purpose,' the Court has not permitted probing into the political affairs of citizens, lobbyists, or other proponents of legislation." *Id.* at *5. Relying on this principle, the Movants contend that none of their statements to legislators are relevant to this case.

Twin Liquors makes a similar assertion, suggesting that there are no cases in which a court has compelled the disclosure of private lobbying communications. Dkt. No. 95 at 4.² It doubles down on this claim in its response to Wal-Mart's motion to compel, raising a novel separation of powers argument:

> It is telling that Plaintiffs have not cited a single case to this Court that compelled a nonparty (or even a party) to produce or testify about his lobbying communications with state actors. There is a fundamental reason for that lack of authority—the "separation of powers" doctrine. The "separation of powers" doctrine animates and informs the limitations on the Court's scope of constitutional inquiry here, even if an inquiry into legislative motives is proper.

Dkt. No. 129 at 4. In fact, the Court's research has located many cases where non-parties have been compelled to produce lobbying conversations, and reviewing the full body of law on this point makes it plain that the *Jones* decision is an outlier. For example, in *Sol v. Whiting*, 2013 WL 12098752 (D. Ariz. Dec. 11, 2013), a case on all fours with the present dispute, the court compelled responses to extremely similar discovery requests, overruling very similar objections to those raised here.³ And

---

²To be precise, Twin Liquors argues that Wal-Mart had not cited any such case, and Twin Liquors did not itself cite any such case as well.

³The six requests at issue there are quoted in the decision, so the court will only repeat one here: "All documents including but not limited to any communications, between you and any Arizona state official since January 1, 2005 relating to proposed, needed, or enacted legislation

in *Page v. Va. State Bd. of Elections*, 15 F. Supp. 3d 657 (E.D. Va. 2014), the court rejected the assertion of legislative privilege by a consultant hired by a party campaign committee, and ordered the production of lobbying materials:

> Both parties have placed squarely into issue the legislative motive in enacting the redistricting legislation. Applying the principles announced in *Marylanders for Fair Representation* [144 F.R.D.292 (D. Md. 1992)], it is, therefore, appropriate to permit the discovery of documents from a non-legislator that are demanded in the subpoena.

*Id.* at 665.  *Page* was a redistricting case, which is a fertile area for exploring the extent to which communications between outsiders with lawmakers are permitted to be discovered in litigation.  In *Rodriguez v. Pataki*, another redistricting case cited by *Page*, the court made a point similar to one the Court queried the parties about at the hearing—the naivete of the idea that the only evidence of a legislature's purpose must be found in the "official" public record.  As the *Rodriguez* court noted, "actions which are legislative do not begin only when a bill reaches the floor of the legislature.  As every high school student knows, the process of drafting legislation is also an important part of how a bill becomes law." *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 101 (S.D.N.Y. 2003).  Thus, that court held that because the New York Legislature created a redistricting committee made up of both legislators and non-legislators, its records were not covered by legislative privilege and were subject to discovery.  *Id.*  In reaching this conclusion, the court noted, *apropos* of this case:

> Indeed, the legislatively-mandated structure of [the committee] makes its workings more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation—*a session for which no one could seriously claim privilege.*

---

regarding immigration or immigrants, including but not limited to the following introduced Bills and Resolutions: [listing eight separate bills]." *Id.* at *1.

*Id.* (emphasis added). There are many other cases where courts have permitted the discovery of lobbying communications from both parties and non-parties when a statute's purposes are in issue, including a decision by the three-judge panel that heard the challenge to the most recent Texas redistricting plan. *Perez v. Perry*, 2014 WL 106927 *2 (W.D. Tex. Jan. 8, 2014) (communications between "any legislator, legislative aide, or staff member" and "any outsider" were not privileged and were discoverable).[4]

In summary, to the extent Movants base their objections on relevance grounds, the weight of authority supports the proposition that legislators' statements to lobbyists or constituents are relevant to determining legislative purpose. Further, the Court concludes that statements by permit holders regarding their views of the effects of the statutes governing retail liquor permits, are also potentially relevant to determining the effects of the challenged statutes. The Court therefore overrules the relevance objections.[5]

---

[4]*See also, Alliance of Auto. Mfrs. v. Gwadosky*, 430F.3d 30, 36-37 (1st Cir. 2005) (considering "communications with members of the legislature" in the course of the lobbying campaign); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 803 (6th Cir. 2005) (evaluating trade association documents for discriminatory origins); *Dex Media West, Inc., v. City of Seattle*, 793 F. Supp. 2d 1213, 1236 (W.D. Wash. 2011) (considering emails from the local lobbying interest to city council members); *Hall v. La.*, 2014 WL 1652791 at *11 (M.D. La. Apr. 23, 2014) (allowing into evidence any information in lawmakers' "possession that were made available to lawmakers" by "outside consultants, experts, or lobbyists").

[5]Notably, Judge Pitman rejected the same relevancy arguments made by Gabriel's to similar discovery requests, stating that Gabriel's "ha[d] contrived to benefit from the Texas Legislature's decisions thereafter," so "the bases for the Texas Legislature's actions [were] central to the constitutional inquiry." Dkt. No. 56 at 3.

### B. First Amendment Privilege

The Movants argue that even if they might be relevant, their communications with legislators are privileged under the First Amendment. Under the Federal Rules, a person may seek to quash a discovery request when it "requires disclosure of privileged or other protected matter, if no exception or waiver applies." FED. R. CIV. P. 45(d)(3)(iii). The party asserting the privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(5)(A)(ii). A party asserting a privilege has the burden of proving the applicability of the privilege. *Hodges, Grant & Kaufmann v. IRS*, 768 F.2d 719, 721 (5th Cir. 1985).

Courts recognize a qualified discovery privilege under the First Amendment, based primarily on the right to peaceably assemble and the right to petition the government found in that amendment. In its 2009 decision in *Perry v. Schwarzenegger,* 591 F.3d 1147, 1159 (9th Cir. 2009), the Ninth Circuit explained the genesis of the privilege:

> "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).

The privilege arising out of the First Amendment is not absolute, however, as it only protects a party from compelled disclosure that would chill the associational rights at issue. *NAACP*, 357 U.S. at

11

462-63. Thus, a party asserting the privilege must make a prima facie showing of an objectively reasonable probability of a chilling effect on their First Amendment rights if the discovery is permitted. *Perry*, 591 F.3d at 1160-61. This means that the party must show that disclosure will deter members of the association from maintaining membership due to fears of threats, harassment, or reprisal from either government officials or private parties. *Id.*

Focusing on this point, Wal-Mart argues that the Movants have failed to meet their initial burden:

> The Package Stores' two affidavits do not meet this standard. These affidavits do not claim that producing these documents would cause anyone to harass, intimidate, retaliate, or take any "reprisal" against them. *See* Dkt No. 130-1 (Lively Decl.); Dkt No. 129-1 (Jabour Decl.). Indeed, the affidavits do not predict any adverse "consequence" to the Package Stores at all—aside from the incidental burden of producing the documents. The affidavits amount to this: The Package Stores would rather not be bothered.

Dkt. No. 133 at 2. For its part, the TPSA describes what it contends the chilling effect to be as: "A person would be compelled to curtail his communications with governmental entities—his political activities—if he knew that over two decades later, all such communications could be required to be produced in a lawsuit to which he is not even party." Dkt. No. 130 at 8. It continues:

> Under the First Amendment, a citizen has assurance that he may freely petition and speak with his governmental representative, without the threat of his business competitor eavesdropping as a matter of right on every single word spoken. It would be news to every lobbyist and legislator throughout the State that their private conversations regarding a law are suddenly rendered public by the mere payment of a filing fee to file a lawsuit alleging the substance of the law is unconstitutional.

*Id.* at 8.

The TPSA and Movants' position regarding the extent of the First Amendment's protection of communications with legislators draws nearly all of its support from the *Jones* decision discussed

earlier, as well as from their reading of a footnote in *Perry v. Schwarzenegger*. As already mentioned, *Jones* is an outlier generally, and, on its facts, is also distinguishable from this case. As the court in *Sol* noted, "*Perry* and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties, let alone public officials." *Sol*, 2013 WL 12098752 at *3. Thus, the court pointed out that while citizens plainly have a right to "communicate with [public] officials on a matter of public concern," that does not mean they have a right to protect these communications from public view. *Id.* at *2. This, however, is effectively what the TPSA contends—that there is a First Amendment right not only to lobby the government, but to do so secretly. Further, in *Jones*, the Florida auto dealers offered evidence that they feared reprisal and retaliation from the manufacturers, and that the manufacturers held economic power over the dealers' livelihoods. Dkt. Nos. 133-2, 133-3. Nowhere in any of the evidence submitted by the Movants here is there any suggestion that they or their members would be subjected to retaliation or reprisal if their communications with legislators are discoverable. Instead, the evidence shows that they prefer that their communications remain private, and if made public, they would be less inclined to communicate with their elected officials in the future. Further, it shows that they would prefer not to have to locate prior written communications, or be forced to testify about them, presumably because it might be burdensome. Neither of these assertions is the type of evidence needed to make a prima facie showing of an objectively reasonable fear of consequences flowing from disclosure sufficient to invoke the First Amendment privilege.

Movants spend a considerable portion of their briefing arguing that, even though its decision was limited to internal communications between members of an association, the Ninth Circuit in *Perry v. Schwarzenegger* suggested (by its citation to a Kansas district court case) that the First

Amendment privilege also protects communications between an association and public officials (*i.e.*, lobbying communications). *See* Dkt. No. 129 at n.4; Dkt. No. 130 at 8. A close look at *Perry* and the case it relies on in the footnote actually reflects very little regarding the *Perry* court's views on whether communications with legislators could be protected under the First Amendment. If anything, it actually supports Wal-Mart's position. In footnote 12 of *Perry*, the court emphasizes that its holding is limited to the internal communications of a political organization, and then makes a "see" citation to *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 407 (D. Kan. 2009). The citation includes a parenthetical quotation of language from that case, stating that the First Amendment privilege applied to "the associations' internal evaluations of lobbying and legislation, strategic planning related to advocacy of their members' positions, and *actual lobbying on behalf of members*." *Perry*, 591 F.3d at 1165 n.12 (*quoting In re Motor Fuel,* 258 F.R.D. at 415). Importantly, that decision was the opinion of a magistrate judge. On appeal, a district judge reversed the decision, and concluded that "[a]ny other communications to, from or within trade associations are not deemed protected under First Amendment associational privilege," including "lobbying and legislative communications between trade associations." *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1163-64 (D. Kan. 2010). The district judge differentiated between communications solely within a trade association and those with outside parties, and summarized the relevant case law as follows:

> *Perry* and *GlaxoSmithKline* are consistent with the weight of authority which requires that a party seeking First Amendment association privilege demonstrate an objectively reasonable probability that disclosure will chill associational rights, *i.e.* that disclosure will deter membership due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities or economic interests.

*Id.* at 1158. Finding that this evidence was lacking, the district judge concluded that the movants there had failed to make a prima facie case that the First Amendment applied. Further, the district judge noted that the primary case relied on by the magistrate judge—also cited by the Movants here—appeared to be the only case that presumed First Amendment protection for lobbying discussions. *Id.* at 1155 (discussing *Heartland Surgical Hosp. v. Midwest*, 2007 WL 852521 (D. Kan. March 16, 2007)). At the end of the day, Movants' reliance on *Perry* and footnote 12 in support of their position is misplaced.

Because the Movants have failed to carry their evidentiary burden to demonstrate that the First Amendment applies to their communications with public actors, by failing to demonstrate an objectively reasonable fear of "threats, harassment or reprisal from either government officials or private parties" flowing from the disclosure of the communications, the Court overrules the objections based on the qualified First Amendment privilege.

**C.     Texas Statutory Privilege**

Spec's makes an argument not raised by the other Movants, based on TEX. GOV. CODE § 306.004. Dkt. No. 105 at 1-2.[6] This statute provides:

> **Sec. 306.004. PUBLIC DISCLOSURE PROHIBITED.** (a) To ensure the right of the citizens of this state to petition state government, as guaranteed by Article I, Section 27, of the Texas Constitution, by protecting the confidentiality of communications of citizens with a member of the legislature or the lieutenant governor, the public disclosure of all or part of a written or otherwise recorded communication from a citizen of this state received by a member or the lieutenant governor in his official capacity is prohibited unless:
>
> (1)     the citizen expressly or by clear implication authorizes the disclosure;

---

[6]Twin Liquors cites this same provision, but does so in the context of its argument under the First Amendment. TPSA does not mention the statute in its briefing.

>    (2)   the communication is of a type that is expressly authorized by statute to be disclosed; or
>    (3)   the official determines that the disclosure does not constitute an unwarranted invasion of personal privacy of the communicator or another person.

The statute also expressly provides that "a member or the lieutenant governor may elect to disclose all or part of a communication to which this section applies." *Id* at § 306.004(c). It is unclear, therefore, how the statute accomplishes its goal of protecting a citizen's right to petition when it grants legislators an unqualified right to disclose a communication without regard to its impact on the citizen. And while "communication" is defined to "include[ ] conversation, correspondence, and electronic communication," § 306.004 only applies to a "written or otherwise recorded communication." Presumably, then, it has no application to unrecorded conversations. Though enacted in 1985, only one Texas court has ever mentioned the statute. *Inwood West Civic Ass'n v. Touchy*, 754 S.W.2d 276 (Tx.App.–Houston [1st. Dist.] 1988).

While no doubt a curiosity, the statute has no application here. In cases governed by federal law, the Federal Rules of Evidence—not state privileges—apply. FED. R. EVID. 501. Without citing any authority, Specs contends that the statute is not a privilege, because it "seeks to implement and enforce constitutional rights." Dkt. No. 105 at 3. That, however, is exactly what the qualified First Amendment privilege discussed at length above does, and yet the federal courts treat that as a "mere" privilege as well. Furthermore, the only Texas case that has ever cited the statute in the 31 years it has been on the books refers to it repeatedly as a "privilege." *See Inwood West Civic Ass'n*, 754 S.W.2d at 276. Specs' argument based on § 306.004 is groundless, and it therefore overruled.[7]

---

[7]Federal common law does recognize a legislative privilege, which has its source in the absolute immunity granted to federal legislators in the Speech and Debate Clause of the Constitution, a privilege which has been extended to state legislators. *Page*, 15 F.Supp. at 661. That privilege, however, has no applicability to communications between legislators and lobbyists or constituents,

**D.     Other Governmental Entities**

Five of the disputed discovery topics challenged by the Movants seek their communications "with any Texas governmental body." Without conceding their communications with those involved in the legislative process are discoverable, Movants argue that surely their conversations with state actors who have no involvement in the legislative process are not relevant here. The Court agrees. With the exception of the (more targeted) request seeking communications with the TABC regarding the consanguinity consolidation procedure in § 22.05 (which might bear relevance to the "effects" of that statute), to the extent Wal-Mart seeks to discover communications between the Movants and state actors *other than* a legislator, his or her staff, the Lieutenant Governor, or the Governor, the Court sustains the Movants' relevance objections.

**E.     TPSA's Newsletters**

An issue presented only by Wal-Mart's motion to compel is whether it is entitled to discover portions of TPSA newsletters from 1994 forward that discuss in any way (1) certain court decisions involving the Dormant Commerce Clause, (2) the passage, enforcement, or attempted amendment or repeal, of the challenged statutes; and (3) campaign contributions to Texas legislators. The TPSA argues that its communications with its members about these topics cannot possibly be relevant to determining either the purpose or the effect of the challenged statutes.[8] Unlike the requests aimed

---

but rather only protects legislator's internal communications . *Perez v Perry*, 2014 WL 106927 at *2-3.

[8]In its response to the motion to compel, TPSA raised for the first time an objection based on the burden that would be involved in reviewing 22 years of newsletters to find any responsive material. Because that objection was first raised in TPSA's response to the motion to compel, but was not preserved in the response to the requests for production, it is waived. Further, Wal-Mart proposed a means by which that burden could be eliminated (*see* Dkt. No. 133 at 1-2 n.2), and the TPSA has not explained why that approach is problematic.

at conversations with state actors, this request seeks the sort of "internal" communications that caused the Ninth Circuit concern in *Perry*. Further, the Court finds the TPSA's contention that its ability to communicate with its members—fundamental to the right to associate—would be chilled if its internal newsletters were discoverable, to be a far more persuasive argument than the contention that the discovery of similar communications with legislators would chill those rights. Given the marginal relevance of the material, the First Amendment privilege applies to the newsletters. Accordingly, the Court will overrule Wal-Mart's motion to compel as to the newsletters.

**F.   Campaign Donations**

TPSA objects broadly to producing any records of campaign contributions, and to being deposed about its contributions.[9] It argues that:

> it would be dangerous precedent to set if Wal-Mart, merely by challenging a statute's constitutionality, can obtain a court order compelling its direct business competitors—who are not parties to the litigation—to produce every document relating to every political contribution to every member of the Texas Legislature during every year over multiple decades. Yet, this is precisely what Wal-Mart is seeking. Any connection between the TPSA's campaign contributions and the constitutionality of specific Texas statutes is so attenuated as to foreclose any conceivable relevance.

Dkt. No. 130 at 6. From its briefing, it appears that TPSA's primary argument is based on relevance, though the mention of the length of time of the request appears to also raise burdensomeness as an

---

[9] Specs objected to the discovery of campaign contributions to the extent the phrasing of the request required it to gather information on "every former and current employee over a 22-year period for every campaign contribution each current or former employee made to any Texas legislator." Dkt. No. 105 at 7. In its response, Wal-Mart agreed to restrict its questions about campaign contributions to "Spec's as an entity, its subsidiaries and affiliated corporations," and also requested permission to inquire about Spec's owners so it can search campaign records for relevant contributions. Spec's did not reply on this point, and the Court agrees that Wal-Mart's requests so circumscribed are reasonable and permissible.

objection. TPSA did not preserve that objection in its discovery responses, however, so any claim of burden is waived.

The Court agrees with the TPSA that as phrased the request is too broad, and also that its potential relevance is marginal. Accounting for these issues, the Court will permit Wal-Mart to obtain records of actual campaign contributions made by the TPSA as an entity for the requested period, to the extent that the TPSA kept such records in a centralized manner. In other words, if the TPSA has a database or something similar, reflecting its historical contributions from which it can easily create or print a list of the contributions for production, then it must do so. But if it does not have such easily accessible records, then Wal-Mart must obtain this information from public sources. If after this process is complete Wal-Mart believes it has not been able to gather the information it contends it needs for trial, it is free to come back to the Court for relief at that time.

### G.  Expert Report

Finally, Twin Liquors' motion to quash includes a request that prior to the Twin Liquors' depositions Wal-Mart be compelled to produce to Twin Liquors Wal-Mart's expert report, so that Twin Liquors might "better understand[ ] the grounds for [Wal-Mart's] attack on the statutory framework under which their industry operates." Dkt. No. 111 at 4. It bases this request on cases supporting the notion of "open courts" and holding that proceedings in the federal courts should be public and not confidential. This argument—at least in the context made by Twin Liquors—has no merit. There is no rule of procedure or other authority that suggests a non-party has a right to see a deposing party's expert report before it must provide sworn testimony, and Twin Liquors fails to offer any explanation as to why its ability to give testimony is in any way constrained by not having access to that report. And because the expert report has not yet been filed or made an exhibit at a

hearing, there is no "open courts" issue to address. In the event that the report is submitted in a court proceeding or motion, the Court can address any sealing issue at that time.

### III. ORDER

For the reasons set forth above, Twin Liquors's Motion to Quash and for Protection and Motion for Declassification (Dkt. No. 95); TPSA's Motion to Modify Deposition Subpoena (Dkt. No. 96); and Spec's Family Partners's Motion to Quash Some Deposition Topics (Dkt. No. 105) are **DENIED** and Plaintiffs' Motion to Compel The TPSA and Twin Liquors to Produce Documents (Dkt. No. 123) is **GRANTED**, provided, however,

- the scope of a "Texas government body" as used in deposition topic numbers 8-12 in the TPSA subpoena, 11-15 in the Spec's subpoena, and 10-14 in the Twin Liquors subpoena, as well as in the similarly phrased requests for production, is limited to Texas legislators, the Lieutenant Governor, or the Governor, and any of their staff;

- the TPSA need not produce its newsletters to its members;

- while Wal-Mart may depose the TPSA regarding their campaign contributions, TPSA need only produce documents regarding contributions if it has a database or something similar from which it can easily create or print a list of the contributions for production.

SIGNED this 11th day of October, 2016.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE