IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WAL-MART STORES, INC., WAL-MART STORES TEXAS, LLC, SAM'S EAST, INC., and QUALITY LICENSING CORP., | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:15-cv-134-RP |
| TEXAS ALCOHOLIC BEVERAGE COMMISSION, JOSE CUEVAS, JR., STEVEN M. WEINBERG, and IDA CLEMENT STEEN, | § § § § § | |
| Defendants, | § § | |
| and | § § | |
| TEXAS PACKAGE STORES ASSOCIATION, INC. | § § § | |
| Intervenor. | § § | |

## **ORDER**

1.      Wal-Mart Stores, Inc. and three of its subsidiaries (collectively, "Wal-Mart") bring

suit against the Texas Alcoholic Beverage Commission and three of its commissioners (collectively,

"TABC"). Wal-Mart raises a constitutional challenge to four Texas statutes, Tex. Alco. Bev. Code

§§ 22.04, 22.05, 22.06, 22.16, governing the issuance of package store permits, which allow the retail

sale of liquor in the state. Generally, the statutes prohibit public corporations, including Wal-Mart,

from obtaining any package store permits, and prohibit other companies with diffuse ownership

from obtaining more than five package store permits. Wal-Mart asserts claims against TABC

pursuant to 42 U.S.C. § 1983 for violations of the dormant Commerce Clause, U.S. Const. art. I, § 8,

cl. 3, and the Equal Protection Clause, U.S. Const. amend XIV, § 1. It seeks a declaration that the statutes are unconstitutional and a permanent injunction against their enforcement.

2.      The Texas Package Store Association ("TPSA") was allowed to intervene as a matter of right to defend the statutes. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562 (5th Cir. 2016).

3.      On June 5–9, 2017, the Court held a bench trial. In light of the entire evidentiary record, the Court now issues the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

## I.      The Parties

4.      Wal-Mart is a retailer that operates approximately 5,000 stores in the United States. Wal-Mart currently sells beer or wine in forty-seven states, and liquor in thirty-one states. Wal-Mart currently sells beer and wine in Texas at 668 locations.

5.      Wal-Mart is a publicly traded corporation. No person owns a majority of its stock.

6.      Wal-Mart has a plan to open liquor stores adjacent to some of its existing Texas locations. These liquor stores would operate on separate premises from Wal-Mart's existing retail stores and would obtain separate package store permits to authorize the sale of liquor. Wal-Mart is prevented from implementing its plan by the statutes challenged in this lawsuit.

7.      TABC is the state agency charged with issuing permits and enforcing the Texas Alcoholic Beverage Code. If Wal-Mart were to apply for a package store permit (which would allow it to sell liquor), TABC would deny Wal-Mart's application based on the challenged statutes.

8.      TPSA is the trade association of Texas package stores. TPSA only accepts applications from package stores that are majority-owned by Texans.

---

[1] All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

## II.    Texas's Off-Premises Retail Permits

9.    To sell alcoholic beverages for off-premises consumption in Texas, retailers must obtain a separate permit for each physical location where alcohol is sold. Each permit authorizes an unlimited volume of sales from the permitted location. There are four off-premises retail permits relevant to this case.

10.    First, a "Package Store Permit," also referred to as a "P permit," authorizes the sale of distilled spirits (commonly referred to as "liquor"), wine, and ale for off-premises consumption. Tex. Alco. Bev. Code § 22.01. This is the permit held by liquor stores (also known as "package stores").

11.    Second, a "Wine Only Package Store Permit," also referred to as a "Q permit," authorizes the sale of wine and ale for off-premises consumption. *Id.* § 24.01.

12.    Third, a "Retail Dealer's Off-Premise License," also referred to as a "BF license," authorizes the sale of beer for off-premises consumption. *Id.* § 71.01.

13.    Fourth, a "Wine and Beer Retailer's Off-Premise Permit," also referred to as a "BQ permit," authorizes the sales of wine, ale, and beer for off-premises consumption. *Id.* § 26.01. The BQ permit is similar to the combination of the BF license and the Q permit. There are, however, some technical differences. First, a Q permit allows a retailer to sell wine with a higher alcohol content than the BQ permit. Second, unlike a BQ permittee, a Q permittee is authorized to apply for some subordinate permits that would allow the Q permittee to transport its inventory between stores and to make certain local deliveries. Large grocery stores typically hold BQ permits to authorize their sales of beer and wine.

## III.    The Challenged Statutes

14.    Wal-Mart challenges four Texas statutes governing the issuance of package store permits. Wal-Mart argues that these statutes, individually and in concert, prevent it from selling

liquor in the state, and challenges the statutes as unconstitutional under the dormant Commerce Clause and the Equal Protection Clause of the United States Constitution.

15.    First, the "public corporation ban" forbids "any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation" from holding a package store permit. Tex. Alco. Bev. Code § 22.16(a). A public corporation is defined as a corporation "whose shares . . . are listed on a public stock exchange" or "in which more than 35 persons hold an ownership interest." *Id.* § 22.16(b). Texas does not forbid public corporations from holding any of the other seventy-five kinds of alcohol permits it issues. Moreover, Texas is the only state that bars public corporations from selling liquor solely because of their status as public corporations.

16.    Second, the "five-permit limit" nominally limits a package store permittee to holding no more than five permits. *Id.* § 22.04. However, this permit cap is subject to a significant exception, discussed below.

17.    Third, the "consanguinity exception" to the five-permit limit authorizes a consolidation process that allows many companies to circumvent the five-permit limit. *Id.* § 22.05. The statute provides that if "two or more persons related within the first degree of consanguinity have a majority of the ownership in two or more legal entities holding package store permits, they may consolidate the package store businesses into a single legal entity." *Id.* The consolidated entity "may then be issued permits for all the package stores, notwithstanding any other provision of this code." *Id.* The practical effect of the consanguinity exception is that the five-permit limit applies only to the following classes of package-store permittees: (1) permittees who lack an individual who owns a majority of the business, and (2) permittees whose majority owner lacks a child, sibling, or parent who is willing and able to assist with the consolidation process.

18.    A fourth and final statute prohibits BQ permittees from also holding an interest in a package store permit. *Id.* § 22.06(a)(2). In contrast to BQ permittees, BF licensees (who sell beer)

and Q permittees (who sell wine and ale) are allowed to hold package store permits. In order to open a package store, Wal-Mart would first be required to abandon its BQ permits and instead obtain BF licenses and Q permits for all of its existing retail locations that sell beer and wine.

## IV. The Texas Liquor Market Is Served By Large, Competitive Package Store Chains

19.     Out of a total of 2,578 active package store permits issued by TABC, 574 are owned by a package store chain (meaning, a business holding six or more package store permits). TABC Ex.-120. There are now 21 such chains. *Id.* The largest chain, Spec's Family Partners, holds 158 permits. *Id.* Since 1944, the chains have greatly increased their number of stores, and their volume of sales, even as the total number of package stores has stayed approximately the same. Tr. June 5, at 225:1–227:3, 251:13–252:6; WM Ex-130.

20.     Many of Texas's package store chains operate large stores with broad selections of products and hundreds of employees. *E.g.*, WM Ex-150; WM Ex-151; WM Ex-178. For example, Gabriel's Liquors operates a 20,000 square-foot "big box liquor close-out store" and has a 40,000 square-foot distribution warehouse. Tr. June 7 (Vol. II), at 3:4–8, 19:5–18. In 2012, Gabriel's had annual revenues of approximately $105 million, a product mix of 20,000 separate SKUs and nearly 300 employees. WM Ex-263, at 12.

21.     The credible evidence demonstrates that package store chains compete vigorously. Package stores offer extensive promotions and discounts. *E.g.*, WM Ex-188. Package stores also compete to be the most convenient to their customers and to offer the largest selection and variety of products.

22.     The credible evidence also demonstrates that package store chains have a very large share of the Texas market. Dr. Kenneth Elzinga, Wal-Mart's expert, testified that package store chains hold between 22% and 40% of the all the package store permits in each of the five most populous Metropolitan Statistical Areas ("MSAs") in the state, which together contain two-thirds of

the state's population. Tr. June 5, at 242:11–244:7; WM Ex-149. This figure likely understates the market share held by package store chains, because Dr. Elzinga did not have data on the volume of spirits sold. According to one report, the four largest chains have more than 60% of the total market share of the retail liquor market in twenty-two Texas cities. Tr. June 5, at 245:18–248.

## V.  The Public Corporation Ban Was Enacted With the Purpose of Discriminating Against Out-of-State Retailers

23.     The credible evidence shows that the public corporation ban was enacted in response to a successful dormant Commerce Clause challenge to a previous Texas law, which imposed a residency requirement that restricted alcoholic-beverage permits to Texas residents and to firms majority-owned by Texans. *See Wilson v. McBeath*, No. A-90-cv-736, 1991 WL 540043 (W.D. Tex. June 13, 1991), *aff'd sub nom. Cooper v. McBeath*, 11 F.3d 547 (5th Cir. 1994) (striking down Tex. Alco. Bev. Code § 109.53).

24.     In May 1993, after the district court struck down the residency requirement but while the appeal was pending before the Fifth Circuit, the Texas Legislature passed House Bill 1445. That law reduced the length of time that the holder of an alcoholic-beverage permit was required to be a resident of Texas (from three years to one) and eliminated the requirement altogether for mixed beverage permits and beer-and-wine permits (but not for package store permits). *See* WM Ex-16 (H.B. 1445), § 6.03(k); Tr. June 7 (Vol. I), at 197:18–24. TPSA viewed the *Cooper* litigation as part of a "tug of war between the legislature and the federal courts over the residency requirement." Tr. June 7 (Vol. I), at 217:20–24. TPSA supported H.B. 1445. *Id.* at 201:3–8.

25.     The purpose of H.B. 1445 was to prevent the Fifth Circuit from issuing a merits decision in *Cooper*. This purpose was revealed during a floor debate on an amendment proposed by Representative Mark Stiles. The Stiles Amendment would have retained the residency requirement for all permits. WM Ex-33, at 4:9–12. During the House debate on this amendment, Representative

6

Stiles noted that the *Cooper* lawsuit was the "real reason" for H.B. 1445's partial elimination of the residency requirement. *Id.* at 8:24–25. He urged his colleagues to "try to settle [their] lawsuit" (referring to the *Cooper* litigation) rather than "take the whole baby and throw it out with the bath water." *Id.* at 10:3–4. Representative Stiles's opponents argued that H.B. 1445 would actually save most of the state's residency requirements because, by eliminating the residency requirement for mixed-beverage permits, the bill would prevent the Fifth Circuit from reaching a broader merits holding in *Cooper* that would strike down the residency requirement for all permits, including specifically package store permits. *Id.* at 6:23–7:11; 16:21–17:15. Some Representatives also stated that a "deal" had been made with the *Cooper* plaintiffs, in which those plaintiffs had pledged to dismiss their case if H.B. 1445 became law. *Id.* at 18:1–7; 8:22–23. The TPSA opposed the Stiles Amendment. *Id.* at 24:3–4.

26.     After H.B. 1445 was passed, the *Cooper* plaintiffs moved to dismiss their lawsuit. 11 F.3d at 551. However, the Fifth Circuit rejected the plaintiffs' suggestion that their case was now moot. *Id.* The Fifth Circuit issued its *Cooper* decision in January 1994. On the merits, it affirmed the district court and struck down the state's residency requirement using broad language that, fairly read, applied not only to mixed-beverage permits but to all other retail permits as well. *Id.* at 554.

27.     During the next Legislative Session, which convened in 1995, the TPSA drafted the public corporation ban. Tr. June 7 (Vol. I), at 225:12–226:24. The drafter of the bill was Fred Niemann, Jr., a lawyer and lobbyist for the TPSA who specialized in legislative affairs. *Id.* at 225:22–226:12, 184:9–185:22. Mr. Niemann was the only witness for the bill; he also drafted fliers to be distributed to legislators and staff explaining the bill. *Id.* at 237:20–24, 238:19–241:4. At his deposition, the bill's Senate sponsor confirmed TPSA's critical role in the bill's enactment, stating that he did not "dream[] up" the bill himself. *See* Armbrister Dep., at 105:6–11.

7

28.     TPSA conceived, drafted and supported the public corporation ban because the TPSA feared that *Cooper* would be applied to strike down the residency requirement for package store permits. Tr. June 7 (Vol. 1), at 192:3–11, 218:20–219:4, 236:14–22. This fear was the "very, very strongest" reason why TPSA drafted the public corporation ban. *Id.* 237:8–9. Without the residency requirement, TPSA was "afraid" that "very large stores could disrupt what had been a very stable business climate" for TPSA's members. *Id.* 220:16–19, 225:8–11. TPSA feared the "Wal-Martization" of the Texas package store market. *Id.* 237:8–10. TPSA considered Wal-Mart to be "the poster child" for the idea that "big stores had come into Texas" and "had driven out of business most mom-and-pop and local businesses." *Id.* 220:20–221:6. The Legislature was aware (from Mr. Niemann's legislative testimony) that the public corporation ban was a response to the *Cooper* decision. WM Ex-288, at 2–3 (written testimony); WM Ex-78, at 4:11–19 (House Committee testimony); PX-63, 10:1–2 (Senate Committee testimony).

29.     The credible evidence demonstrates that, if not for the Fifth Circuit striking down Texas's residency requirement, TPSA would not have proposed, and the Legislature would not have enacted, the ban on public corporations holding package store permits.

30.     The public corporation ban did not affect any of the incumbent package store permittees, all of whom were Texans or were majority-owned by Texans. Tr. June 7 (Vol. I), 220:2–8. TPSA was not aware of any (Texas-owned) public corporations that held package store permits in 1995. *Id.* at 219:18–24. Even if a Texas-owned public corporation did hold a package store permit, that corporation would have been exempted from the ban, due to the ban's grandfather clause. *Id.* at 258:13–25; *see also* Tex. Alco. Bev. Code § 22.16(f). Johnny Gabriel created two Texas-owned public corporations immediately prior to the public corporation ban taking effect. Tr. June 9 (Vol. II), at 13:4–14.

31.     While TPSA's lawyer and lobbyist testified at trial that the purpose of the public corporation ban was to preserve a favorable "business climate" for TPSA's members, Tr. June 7, 220:16–19, in its formal lobbying efforts for the public corporation ban, the TPSA offered a different rationale. In its testimony to the Legislature, TPSA claimed the public corporation ban was needed to promote "accountability," or the need "to have real human beings who are easily identifiable, who are close to the business, and who ultimately bear personal responsibility for the actions of the package store." WM Ex-288, at 2–3 (written testimony); WM Ex-78, at 4:11–19 (House Committee testimony); WM Ex-63, at 10:1–2 (Senate Committee testimony).

32.     TPSA presented no evidence to the Legislature of any actual problems with corporate accountability in the sale of distilled spirits or of any other product. Tr. June 7 (Vol. I), 251:8–253:5. At trial, Mr. Niemann admitted he was "speculating" when he testified to the Legislature that public corporations might be less accountable. *Id.* 252:2–5. The lack of any evidence is telling because public corporations had been able to obtain package store permits since 1935 (so long as they were majority Texan-owned) and because out-of-state public corporations had been allowed to hold both mixed-beverage and beer-and-wine permits since 1993. *Id.* at 198:14–200:15, 250:21–253:5.

33.     The credible evidence suggests TPSA devised the "accountability" rationale in order to obscure the ban's discriminatory purpose. Mr. Niemann, a lawyer, was aware of the *Cooper* litigation and knew that the legislative history of the public corporation ban would likely be reviewed for evidence of discriminatory purpose. *Id.* at 253:13–254:16. Mr. Niemann admitted that he "knew that any bill might be challenged" and that his "assignment was to craft a bill which [the TPSA] felt would survive a commerce clause challenge." *Id.* 253:19–22. In light of the absence of any evidence in the record indicating TPSA was concerned about promoting corporate accountability and Mr. Niemann's testimony that TPSA's chief concern was maintaining the business climate created by the

residency requirement, the Court concludes that the proffered "accountability" rationale was pretextual. TPSA, in its testimony to the Legislature, speculated that the public corporation ban would promote corporate accountability in order to conceal the ban's actual discriminatory purpose (to protect Texas package store owners from out-of-state competition).

34. The Senate sponsor of the public corporation ban, Senator Kenneth Armbrister, confirmed the discriminatory purpose of the law during the Senate floor debate. When asked to explain the ban's purpose, Senator Armbrister's first answer was that the ban means that "you can't have a package store inside a Walmart" and "Walmart can't own the package store." WM Ex-66, 4:8–15. Senator Armbrister later agreed with a colleague's statement that the Legislature "wanted to have *somebody from Texas* with the license that you get hold of to enforce the Code." *Id.* at 7:10–16 (emphasis added).

## VI. Appeals to Discrimination Against Out-of-State Companies Prevented Repeal of the Public Corporation Ban, the Five-Permit Limit, and the Consanguinity Exception

35. Bills to repeal the five-permit limit and the consanguinity exception were introduced in 2009, 2013, and 2015. In addition, two bills introduced in 2015 would have repealed all the statutes challenged in this lawsuit, including the public corporation ban. TPSA successfully lobbied against these repeal efforts by making blatantly discriminatory arguments in testimony to the Legislature. *See* WM Ex-109, at 19:5-21:15 (2013 Senate testimony); WM Ex-101, at 22:11-26:5 (2009 Senate testimony); *see also* WM Ex-105, at 11:25-21:2 (2013 House testimony); WM Ex-97, at 12:18-14:23 (2009 House testimony).

36. In 2009, a TPSA representative testified, "[R]epealing the five store limit would open the door wide for out-of-state big box chains to enter the Texas market and use massive marketing power to displace Texas liquor stores. The profits of these corporations would then be shipped off to Arkansas and other states instead of remaining here in Texas." WM Ex-101, at 24:15–21.

Similarly, in 2013, a TPSA representative testified that repeal would "open it up for [companies] outside Texas to come in and take the money right out of the state." WM Ex-109, at 24:16–19.

37.     TPSA also made these discriminatory arguments in its written lobbying materials. *See* WM Ex-251; WM Ex-256; WM Ex-275; WM Ex-278. For example, in one piece of legislative advertising, TPSA asserted that "Wal-Mart wants to take profits that are now going to local Texas businesses, profits that are now staying in local Texas communities, and instead, Wal-Mart wants to send those profits to Bentonville, Arkansas!" WM Ex-256. In another handout, entitled "Alcohol Laws Favor and Protect Texas Liquor Stores," TPSA argued approvingly that "[t]he Alcoholic Beverage Code is biased in favor of Texas ownership of liquor stores." WM Ex-275. The TPSA handout explained that "all 2,300 liquor stores in the state are still owned by Texas residents" because of "the prohibition in the Code against a corporation with more than 35 shareholders." *Id.* TPSA warned that because "Wal-Mart has hundreds of thousands of shareholders . . . repealing the 35-shareholder provision would allow Wal-Mart to own and operate liquor stores in Texas." *Id.*

## VII.     The Public Corporation Ban Disproportionately Affects Out-of-State Companies

38.     The credible evidence demonstrates that the public corporation ban disproportionately affects out-of-state companies. The law disproportionately burdens out-of-state companies' ability to enter the Texas retail liquor market. Certainly, the statute has the effect of preventing both some in-state and some out-of-state firms from entering the Texas retail liquor market. Yet, only a very small percentage of the in-state firms that would otherwise serve this market are prevented from doing so by the public corporation ban. On the other hand, a very large percentage of the out-of-state companies that would otherwise serve this market are blocked. In fact, the credible evidence suggests that the overwhelming majority of out-of-state companies that would otherwise sell liquor in Texas cannot do so because of the public corporation ban.

39.     The vast majority of package store businesses operating in Texas are owned by Texas residents. According to the TABC, there are a total of 1,765 package store firms in the state, holding a total of 2,579 permits. TABC Ex-73. Only four of those package store firms are out-of-state entities; those four firms hold a total of five permits. Tr. June 7 (Vol. I), at 102:11–103:1, 103:20–104:5; TABC Ex-32. Only thirty-seven of those package store firms are held by an entity with a single out-of-state shareholder; those thirty-seven firms hold a total of forty-eight permits. Tr. June 7 (Vol. I), at 104:6–106:3; TABC Ex-33. Thus, only around 2% of Texas package store firms and around 2% of Texas package stores have any out-of-state ownership. Ninety-eight percent of Texas package stores and Texas package store companies are wholly owned by Texans. (Of course, a package store or package store company that is not wholly owned by Texans may still be majority owned by Texans.)

40.     Dr. Elzinga's analysis of Texas's largest alcoholic beverage retailers also provides credible evidence that the public corporation ban disproportionately burdens out-of-state companies. The ten largest package store chains in Texas's five most populous MSAs are all Texas-owned, with a single exception in Dallas (Total Wine & More). Tr. June 6, at 45:14–20; WM Ex-173. By contrast, the ten largest beer-and-wine retailers in these same MSAs are evenly split between Texas retailers and out-of-state retailers. Tr. June 6, at 40:9-41:4, 41:22–42:6, 46:8–48:24; WM Ex-173. Because beer, wine and spirits are related markets, and because the public corporation ban does not apply to beer or wine permits, Dr. Elzinga credibly concluded that the dominance of Texas-owned firms in the package store market is the result of the challenged statute. Tr. June 6, at 49:6–11.

41.     Dr. Elzinga also credibly testified about the mechanism by which the public corporation ban excludes out-of-state entrants. Dr. Elzinga identified twenty-eight out-of-state firms that might enter the Texas package store market, if the challenged statutes were removed. These are

firms that (1) sell spirits in states other than Texas, or sell beer or wine in Texas; and (2) have over $1 billion in annual revenues. Tr. June 6, at 49:12–52:4, 56:11–57:14. All twenty-eight of these firms are likely entrants, and all twenty-eight are blocked by the public corporation ban. *Id.* at 50:13–24; PX-174. None of TABC's or TPSA's expert witnesses identified any additional likely out-of-state entrant (other than Total Wine & More) that is not blocked by the law.

42.     Indeed, the weight of the available evidence indicates that very few out-of-state firms with fewer than thirty-five shareholders are realistic potential entrants to the Texas market. Expanding into even a neighboring state requires capital and scale. *See* Tr. June 6, at 56:11–57:14. Firms with the required capital and scale are almost always firms that have diffuse ownership. *See id.* It follows that the out-of-state companies that are most likely to enter the Texas retail liquor market—those with the necessary capital and scale—are the same companies that are blocked by the public corporation ban.

43.     Dr. Elzinga identified only three Texas-based firms that otherwise would be likely to enter the package store market but which are blocked from doing so because they are publicly traded. Tr. June 6, at 52:25–53:18; WM Ex-175. He identified another three in-state firms that are likely blocked, but, because they are privately held, their exact number of owners is unknown. *Id.* On cross-examination, he acknowledged a handful of other in-state companies that might be barred by the challenged statute. Regardless of the exact number (which is impossible to measure with precision), it is clear that there are only a handful of potential in-state entrants barred by the public corporation ban. The handful of barred in-state entrants is dwarfed by the nearly two thousand Texas-owned firms already serving the package store market. It follows that a very small percentage of potential in-state entrants are blocked by the challenged statutes.

44.     TABC and TPSA rely on the testimony of Dr. Devrim Ikizler, one of TPSA's experts, to argue that the public corporation ban does not disproportionately affect out-of-state

companies. *See* Tr. June 9 76:6–79:6; TPSA Ex-47. Having considered this testimony, the Court finds it unpersuasive. Dr. Ikizler compares the top ten package store permit holders (which hold between 15 and 160 permits each) to the BQ permit holders (beer and wine retailers) that have a comparable number of permits. He found that 90% of the package store permittees with between 15 and 160 permits are in-state companies, whereas 94% of BQ permittees with between 15 and 160 permits are in-state companies. The problem with this testimony is that beer and wine retailers tend to hold many more permits than package store companies. One reason for this is that beer and wine retailers are not subject to Texas's separate premises requirements, which means that many businesses (for example, convenience stores) are eligible to sell beer and wine but not liquor. Consequently, Dr. Ikizler's analysis compares the very largest package store firms to a set of relatively small beer and wine retailers, without accounting for the fact larger companies are more likely to be from out of state. Moreover, with regard to the effect the public corporation ban has on out-of-state companies, the remainder of Dr. Ikizler's testimony errs by asking whether the number of Texas companies in the retail liquor market is comparable to Texas's share of the population or Texas's share of the Top 100 retailers nationwide. *E.g.*, TABC Ex-48. This is not the appropriate method of assessing whether a statute disproportionately affects interstate commerce. *See* infra Section X.C.

45.     In some instances, the effects of a law on interstate commerce can be easily measured by comparing the composition of the market before the law's introduction to the composition of the market after the law is in place. Here, Texas enforced its unconstitutional residency requirement for more than ten years after the introduction of the public corporation ban. It is thus impossible to know with certitude what the package store market would look like without the public corporation ban and without the residency requirement. However, the credible evidence suggests that, without the public corporation ban, a substantially larger share of the firms

participating in the Texas retail liquor market would be from out of state. Because we know that, with the public corporation ban, the market is overwhelmingly served by companies wholly owned by Texans, it follows that the ban has blocked the majority of potential out-of-state entrants. At the same time, it is clear that the ban has blocked only a handful of potential in-state entrants. For that reason, the Court concludes that the public corporation ban disproportionately burdens out-of-state companies.

## VIII. The Challenged Statutes May Affect the Price, Convenience, and Consumption of Liquor

46.     The consumption of alcohol can contribute to a numerous health problems including liver disease, heart disease, strokes, and cancer, and is associated with numerous other social ills, including drinking and driving, child and spousal abuse, homicides, and suicides. Tr. June 8 (Vol. II), at 18:22–20:13; Tr. June 8 (Vol. I); at 87:3–88:1. The economic costs resulting from excessive drinking are substantial. Tr. June 8 (Vol. I), at 88:2–89:1.

47.     Alcohol consumption is responsive to price. There is broad consensus that increasing the price of alcohol is an effective way to reduce the consumption of alcohol and the harms and externalities associated with alcohol consumption. Tr. June 8 (Vol. I), at 29:19–25, 85:10–86:3. Additionally, policies limiting the number of retail outlets selling alcohol can be effective in reducing alcohol consumption, and greater outlet density is associated with an increase in the harms and externalities associated with alcohol consumption. Tr. June 6, at 170:12–17, 175:1–19, 178:2–6; Tr. June 8 (Vol. II), at 28:13–31:2.

48.     In enacting the public corporation ban, the Texas Legislature could have reasonably believed that allowing public corporations to sell liquor in the state would lead to large corporations entering the market, increasing the total supply of liquor and putting downward pressure on prices. Similarly, the Texas Legislature could have reasonably believed that allowing public corporations to

sell liquor in the state would lead to more companies selling liquor at retail, increasing the total number or retail outlets selling liquor in the state. Additionally, the Texas Legislature could have reasonably believed that public corporations are likely to be larger and have access to more capital than other retailers, and consequently enjoy a scale advantage that would allow them to sell liquor at a discount. Tr. June 8 (Vol. I), at 98:2–7; Tr. June 9 (Vol. II), at 201:21–24; 201:24–25.

49.     However, to the extent that the public corporation ban has an effect on the price or availability of liquor in Texas, this outcome could be achieved through alternative measures, including the imposition of an excise tax or through regulatory measures that directly control how and where liquor can be sold and how many outlets are allowed to sell liquor. Specifically, excise taxes are widely used to reduce alcohol consumption and their efficacy is commonly accepted. All five experts testified to the efficacy of excise taxes. Tr. June 5, at 261:2–262:12 (Elzinga); Tr. June 6, at 61:18–63:12; 117:21–119:8; 225:22 to 226:11; 241:8–245:17 (Elzinga); Tr. June 8 (Vol. I), at 69:1–70:10 (Chaloupka); Tr. June 8 (Vol. II), at 24:1–26:1 (Gruenewald); Tr. June 9 (Vol. II), at 49:9–20, 129:6–130:14 (Ikizler); Tr. June 9 (Vol. II), at 182:14–19 (Magee).

## IX.     The Challenged Statutes Do Not Promote Corporate Accountability

50.     The credible evidence demonstrates that public corporations are not less accountable than firms with fewer than 35 owners. Dr. Elzinga testified that the ten largest BQ permittees (including Wal-Mart) had fewer TABC violations per store than did the ten largest P permittees. Tr. June 6, at 32:6–38:21. Moreover, he testified that there is no support in the academic literature for the notion that public corporations are less accountable to regulators than privately held corporations. *Id.* at 33:12–34:21. To the contrary, the literature indicates public corporations tend to be very concerned with compliance and reputation. Dr. Elzinga's opinion was not rebutted by the TABC's or the TPSA's experts.

51.     TABC already holds public corporations accountable for their sales of beer and wine at retail, for their sales of spirits in hotels, and for their sales of mixed beverages in bars and restaurants. Tr. June 7 (Vol. I), at 162:15–163:12; 172:13–25. Neither TABC nor TPSA has shown a single instance in which the state has been unable to contact or hold accountable a public corporation.

## CONCLUSIONS OF LAW

### X.     Dormant Commerce Clause

52.     The United States Constitution affords Congress the power to "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "The Supreme Court has long recognized that this provision has a necessary, logical corollary: If Congress has the power to regulate commerce among the states, then the states lack the power to impede this interstate commerce with their own regulations." *Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003). The "dormant Commerce Clause" serves as "a substantive restriction on permissible state regulation of interstate commerce." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991).

53.     A state regulation can violate the dormant Commerce Clause in one of two ways. First, a law is presumptively invalid if "it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citing *Bacchus Imports, Ltd. v Dias*, 468 U.S. 263, 270 (1984)). A law that so discriminates "is valid only if the state 'can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *Id.* (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)). Second, a law that does not directly discriminate against interstate commerce violates the dormant Commerce Clause only if it imposes a burden on interstate commerce that "is 'clearly excessive' in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This

more deferential standard of review for laws that burden but do not discriminate against interstate commerce is known as the *Pike* balancing test.

54.    Wal-Mart argues that the public corporation ban, the five-permit limit, and the consanguinity exception discriminate against interstate commerce in both their purpose and their effect. Alternatively, Wal-Mart argues that the statutes fail *Pike* balancing.

55.    The Court concludes that the public corporation ban was enacted with discriminatory intent: one of the legislature's primary purposes in passing the ban was to exclude out-of-state companies from participating in the Texas retail liquor market. Neither TABC nor TPSA argues that the ban can survive the rigorous scrutiny applied to discriminatory statutes. The ban's discriminatory purpose renders it inconsistent with the dormant Commerce Clause and therefore unconstitutional.

56.    However, the Court cannot conclude that the public corporation ban has a discriminatory effect. Admittedly, the ban disproportionately affects out-of-state companies. It serves to exclude from the Texas retail liquor market the vast majority of potential out-of-state entrants. Consequently, the market is served almost exclusively by in-state companies. Yet, the public corporation ban nominally treats similarly situated in-state and out-of-state companies equally. Under controlling precedent, this is sufficient to avoid a finding of discriminatory effect.

57.    Wal-Mart also argues that the public corporation ban fails the *Pike* balancing test. The Court agrees. The weight of the evidence suggests that the statutes impose on interstate commerce a burden that is clearly excessive relative to the laws' putative benefits. Thus, even if the statute is not so discriminatory as to warrant strict scrutiny, it nonetheless fails under the more deferential standard of review applied to laws that incidentally burden interstate commerce.

58.     Finally, the Court declines to find that either the five-permit limit or the consanguinity exception independently offend the dormant Commerce Clause. The available evidence is insufficient to conclude that either statute burdens interstate commerce.

## A.     The Purpose of the Public Corporation Ban Is to Discriminate Against Out-of-State Companies

59.     A state regulation violates the dormant Commerce Clause if it "discriminates against interstate commerce . . . by purpose." *Allstate*, 495 F.3d at 160 (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)). In determining whether a law purposefully discriminates against interstate commerce, the Fifth Circuit uses the four factors set forth in *Arlington Heights*, which include: "(1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up to the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers." *Id.* (citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–268 (1977)). Here, all four *Arlington Heights* factors demonstrate that the purpose of the ban was to discriminate against out-of-state companies.

60.     First, "a clear pattern of discrimination emerges from the effect of the" public corporation ban. *Id.* The ban has had the effect of barring nearly all out-of-state companies with the scale and capabilities necessary to serve the Texas retail liquor market. *See* supra Section VII. Over 98% of Texas package stores and Texas package store companies are 100% Texas-owned. *Id.* Since Texas ceased enforcing its unconstitutional residency requirement, only one significant out-of-state company has entered the Texas market. *Id.*

61.     Second, there is an undeniable "history of discrimination by the decisionmaking body." *Allstate*, 495 F.3d at 160. The Texas Legislature, through a variety of laws (collectively, the

"residency requirement"), has expressly prohibited out-of-state persons and companies from owning package stores since the passage of the Liquor Control Act. In 1994, the Fifth Circuit found that the residency requirement, at least as applied to a different type of liquor permit not at issue here, was discriminatory and inconsistent with the dormant Commerce Clause. *Cooper*, 11 F.3d at 555–56. Nonetheless, Texas continued to enforce the residency requirement as applied to package store permits for another twelve years, ceasing enforcement only when it was permanently enjoined by a federal district court. *Wine & Spirits of Texas, Inc. v. Steen*, 486 F. Supp. 2d 626, 633 (W.D. Tex. 2007). To this day, the residency requirement remains on the books. *E.g.*, Tex. Alco. Bev. Code § 109.53.

62.     Third, the "specific sequence of events leading up to the challenged decision" evinces discriminatory purpose. *Allstate,* 495 F.3d at 160. Specifically, the proximate cause of the Legislature's decision to enact the public corporation ban was the Fifth Circuit's decision invalidating the residency requirement. *See* supra Section V. If not for the *Cooper* decision, the public corporation ban would never have been conceived, drafted or enacted. *Id.* The Legislature attempted to strike a deal to moot the *Cooper* appeal and thus avoid a broad ruling that would jeopardize the enforceability of all its residency requirements. *Id.* After this strategy failed, the Legislature enacted the public corporation ban in the very next session. *Id.*

63.     Fourth, "the legislative . . . history of the state action" includes direct evidence of discriminatory purpose. *Allstate*, 495 F.3d at 160. The Senate sponsor of the public corporation ban agreed that the purpose of the ban is to make sure that package stores are owned by "somebody from Texas" and to guarantee that "you can't have a package store inside a Wal-Mart." WM Ex-66, at 4:8–15, 7:10–15. The lobbyist who drafted the bill and served as its sole witness testified that the purpose of the public corporation ban was to preserve the "stable business climate" created by the

residency requirement.[2] Tr. June 7 (Vol. I), at 225:8–11. No reasonable inference can be drawn from these statements other than that the Legislature enacted the public corporation ban with the purpose of preventing out-of-state companies from entering the market in the event that the courts extended *Cooper* to invalidate the residency requirement as applied to package store permits.

64.     Having reviewed the available evidence in light of the four *Arlington Heights* factors, the Court concludes that the purpose of the public corporation ban is to discriminate against out-of-state retailers in order to protect locally owned package stores.

65.     This conclusion finds additional support from TPSA's reliance on expressly discriminatory arguments in its lobbying efforts to prevent the Legislature from repealing the public corporation ban.[3] *See* supra Section VI. For example, one handout created by the TPSA for the purpose of lobbying stated that "all 2,300 liquor stores in the state are still owned by Texas residents" in part because of "the prohibition in the Code against a corporation with more than 35 shareholders." WM Ex-275. TPSA's consistent reliance on protectionism as its central argument against repeal efforts provides circumstantial evidence that in 1995 when TPSA drafted and lobbied for the public corporation ban it was motivated by a desire to protect Texas-owned package stores from out-of-state competition. Similarly, these statements provide some circumstantial evidence that TPSA offered and the Legislature acted on protectionist arguments when drafting and enacting the public corporation ban.

---

[2] In assessing the purpose of the public corporation ban, the Court may rely on statements made by TPSA and its representatives. *See Allstate*, 495 F.3d at 161 (relying on statements by non-legislator witnesses in assessing purpose of challenged law); *S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 596–97 (8th Cir. 2003) (finding discriminatory purpose based on statements made by law's proponents, and therefore holding the law violated the dormant Commerce Clause); *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 443 (6th Cir. 2000) (same).

[3] The Court's finding that the public corporation ban was enacted with discriminatory purpose does not turn on the evidence from subsequent repeal efforts. This evidence is, however, appropriately considered. *See Maine v. Taylor*, 477 U.S. 131, 149 (1986) (considering, in assessing the purpose a law enacted in 1959, statements made by those who opposed an unsuccessful repeal effort in 1981).

66.     TPSA argues that much of the evidence of discriminatory purpose can be construed as evidence of intent to discriminate against large companies, not out-of-state companies. The Court is not persuaded. As explained above, the weight of the evidence indicates the Legislature specifically intended to exclude out-of-state companies in order to benefit incumbent, locally owned package stores. Moreover, TPSA's insistence that the public corporation ban was motivated by concerns about the role of large businesses is belied by TPSA's repeated efforts to defend the consanguinity exception, which serves to remove any cap on the growth of most locally-owned package store companies. If the Legislature, in enacting the ban, was motivated primarily by a desire to limit the size of package store companies, it is difficult to conceive why it would maintain a provision that prevents the imposition of a limit on the size of most package store companies.

67.     The Legislature's discriminatory purpose in enacting the public corporation ban is sufficient to trigger strict scrutiny. The Fifth Circuit has repeatedly said so. *Allstate*, 495 F.3d at 160 (citing *Bacchus Imports*, 468 U.S. at 270) (emphasis added) ("A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, *or* by effect."); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 725 (5th Cir. 2004) (emphasis added) ("A court may find discrimination based on evidence of discriminatory effect *or* discriminatory purpose."); *see also Churchill Downs Inc. v. Trout*, 589 F. App'x 233, 234 (5th Cir. 2014) (quoting *Allstate*, 495 F. 3d at 160). Moreover, multiple federal courts of appeals have found a law to violate the dormant Commerce Clause on the basis of discriminatory purpose alone. *See S. Dakota Farm Bureau*, 340 F.3d at 596–97; *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 341, 345 (4th Cir. 2001). Absent some controlling clarification to the contrary, the Court is compelled to apply strict scrutiny in light of its finding that the public corporation ban was enacted with discriminatory purpose.

68.     When a law discriminates against interstate commerce, courts apply the "strictest scrutiny." *Oregon Waste Sys. Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 101 (1994). "If a restriction on

commerce is discriminatory, it is virtually *per se* invalid." *Id.* at 99. A discriminatory law "is valid only if the state 'can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *Allstate*, 495 F.3d at 160 (quoting *C & A Carbone*, 511 U.S. at 392). Here, neither TABC nor TPSA argues that the public corporation ban satisfies this burden. Thus, the Court concludes that the public corporation ban—enacted with the purpose of discriminating against interstate commerce—violates the dormant Commerce Clause.

### B. The Public Corporation Ban Does Not Have a Discriminatory Effect

69.     A state regulation also violates the dormant Commerce Clause if it "discriminates against interstate commerce . . . by effect." *Allstate*, 495 F.3d at 160 (citing *Bacchus Imports*, 468 U.S. at 270). The parties disagree as to the appropriate test to measure discriminatory effect. Wal-Mart argues that a law has a discriminatory effect if it disproportionately benefits in-state interests at the expense of out-of-state interests. *See Churchill Downs*, 589 F. App'x at 237 (recognizing that evidence indicating a law "disproportionately affects out-of-state companies" is evidence of discriminatory effect). TABC and TPSA argue that even if a law disproportionately affects out-of-state companies, there can be no discriminatory effect unless the law differentiates between similarly situated in-state and out-of-state companies. *See Allstate*, 495 F.3d at 163 ("A state statute impermissibly discriminates only when it discriminates between similarly situated in-state and out-of-state interests."). The question is thus whether a court can properly find a discriminatory effect when a law treats similar in-state and out-of-state companies equally but as a practical matter disadvantages out-of-state interests.

70.     Wal-Mart's position draws some support from Supreme Court precedent. In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court considered the constitutionality of a North Carolina statute that required all closed containers of apples shipped into the state to bear "no grade other than the applicable U.S. grade or standard." 432 U.S. 333, 335 (1977). At the time,

many states other than North Carolina had implemented their own grading systems. *Id.* Among those states was Washington State, the nation's largest producer of apples with its apples accounting for nearly 50% of all apples shipped in interstate commerce. *Id.* at 336. The Supreme Court applied heightened scrutiny to the statute because it raised the cost of doing business in the North Carolina market for out-of-state apple growers and therefore discriminated against them. *Id.* at 351–352. The Court acknowledged "the statute's facial neutrality," but nonetheless found a discriminatory effect because the statute's "practical effect" was to burden out-of-state growers. *Id.* at 350–352; *see also Bacchus Imports*, 468 U.S. 263 (1984) (finding a Hawaii tax exemption for certain wines to have a discriminatory effect because as a practical matter those wines were more common in Hawaii).

71.     Wal-Mart's position that a disproportionate impact on out-of-state companies is a sufficient basis to find a discriminatory effect is bolstered by persuasive authority from two federal courts of appeals. In *Cachia v. Islamorada*, the Eleventh Circuit considered a municipal ordinance banning all "formula restaurants," defined to include most chain restaurants and fast food restaurants. 542 F.3d 839, 840–841 (11th Cir. 2008). The ordinance was facially neutral and affected both in-state and out-of-state companies. *Id.* at 842. Put differently, the ordinance blocked many in-state restaurants and allowed many out-of-state restaurants. *Id.* Nonetheless, the court determined that the ordinance had a discriminatory effect because it operated as "an explicit barrier to the presence of national chain restaurants." *Id.* The court reasoned that "[w]hile the ordinance does not facially discriminate between in-state and out-of-state interests, its prohibition of restaurants operating under the same name, trademark, menu or style is not evenhanded in effect, and disproportionately targets restaurants operating in interstate commerce." *Id.* at 844. Relying on *Hunt*, the court found that the ordinance had "the practical effect of discriminating against interstate commerce" and instructed the district court to apply heightened scrutiny.

72.     Similarly, in *Family Winemakers of California v. Jenkins*, the First Circuit considered the constitutionality of a Massachusetts statute that allowed only small wineries (defined as producing 30,000 gallons or less of wine a year) to obtain a "small winery shipping license." 592 F.3d 1, 4 (1st Cir. 2010). The holder of such license could sell wine by shipping directly to consumers, through wholesaler distribution, or through retail distribution. *Id.* Large wineries, on the other hand, were forced to choose between either shipping directly to consumers or using wholesaler distribution. Unlike small wineries, the law did not allow them to do both, and it did not allow them, under either option, to sell directly to retailers. *Id.* While the law did not expressly differentiate between in-state and out-of-state wineries, the court found discriminatory effect, because it "significantly alter[ed] the terms of competition between in-state and out-of-state wineries to the detriment of the out-of-state wineries that produce 98 percent of the countries wine." *Id.* at 11. While the law did not outright bar any winery from distributing in Massachusetts, the court concluded that its "ultimate effect" was to "artificially limit the playing field in [the] market in a way that enables Massachusetts's wineries to gain market share against their-out-state competitors." *Id.*

73.     *Hunt*, *Cachia*, and *Family Winemakers* all instruct that a law discriminates against interstate commerce if it has the practical effect of disproportionately advantaging in-state interests at the expense of out-of-state interests. And the Fifth Circuit has acknowledged that evidence indicating a law "disproportionately affects out-of-state companies" is evidence of discriminatory effect. *See Churchill Downs*, 589 F. App'x at 237. If this were this appropriate standard, the Court would easily find that the public corporation ban has a discriminatory effect: the available evidence suggests that the ban's effects are felt disproportionately by out-of-state companies, which are largely barred from selling liquor in Texas. *See* supra Section VII; infra Section X.C.

74.     But TABC and TPSA point to a contrary line of cases that define discriminatory effect much more narrowly. In at least three controlling cases, higher courts have upheld state

regulations as consistent with the dormant Commerce Clause because the regulations treat similarly situated in-state and out-of-state companies the same, even when those regulations disproportionately affect out-of-state companies.

75.     In *Exxon v. Governor of Maryland*, the Supreme Court upheld a state law, which prohibited companies that produce or refine petroleum products from also operating retail gas stations, over the plaintiff's objection that the law disproportionately affects out-of-state petroleum companies. 437 U.S. 117 (1978). The majority reasoned that the Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Id.* at 127. The *Exxon* Court concluded that the ban on refiners owning retail gas stations was permissible because it did not "distinguish between in-state and out-of-state companies in the retail market." *Id.* "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Id.*

76.     The Fifth Circuit has twice relied on *Exxon* to uphold statutes that arguably disproportionately affect out-of-state companies. In *Ford Motor Corp. v. Texas Department of Transportation*, the court considered a statute which, as interpreted, prohibited automobile manufacturers from selling vehicles directly through their website. 264 F.3d 493, 498 (5th Cir. 2001). The court stated that discrimination under the dormant Commerce Clause does not "include all instances in which a law, in effect, burdens some out-of-state interest while benefitting some in-state interest." *Id.* at 500. Rather, for a law to have a discriminatory effect it must provide "for differential treatment based upon their contacts with the State." *Id.* at 501. Ultimately, the court upheld the law at issue because Ford "failed to show that . . . in practical effect, [the law] discriminates according to the extent of a business entity's contacts with the State." *Id.* at 501. Similarly, in *Allstate Insurance Co. v. Abbott*, the Fifth Circuit upheld a law prohibiting insurance companies from obtaining an interest

in a body shop, notwithstanding the plaintiff's argument that the law disproportionately affects out-of-state insurers. 495 F.3d 151 (5th Cir. 2007). The Court determined that *Exxon* was controlling.

77.     *Exxon*, *Ford*, and *Allstate* allow for the possibility that a law that is not facially discriminatory may still have a discriminatory effect if it disproportionately impacts out-of-state companies. For example, the Supreme Court in *Exxon* acknowledged, at least in a footnote, that "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce." *Exxon*, 437 U.S. at 126 n.16; *but see Allstate*, 495 F.3d at 162 (affording minimal weight to this footnote). But the clear implication of these cases is that a finding of discriminatory effect requires something close to facial discrimination. After all, it would seem that a facially neutral statute by definition treats similarly situated entities equally.

78.     In light of the fact that the public corporation ban does not expressly differentiate between companies based on their ties to Texas, the Court is skeptical that a finding of discriminatory effect is appropriate. That said, there is arguably a basis to distinguish *Exxon*, *Ford*, and *Allstate*. Those cases involved narrow regulations that may have disproportionately affected out-of-state companies but did not serve to bar most out-of-state companies from entering the market. For example, in *Exxon*, the record showed that "there are several major interstate marketers of petroleum that own and operate their own retail gasoline stations . . . who compete directly with the Maryland independent dealers, [and] are not affected by [the regulation at issue] because they do not refine or produce gasoline." 437 U.S. at 125–126. Similarly, in *Allstate*, the record was "unclear" as to "how the new regulations would affect any shift in the current level of business presently enjoyed by out-of-state suppliers of body shops to in-state shops." 495 F.3d at 163. Here, the record shows that the challenged statutes bar the majority of potential out-of-state entrants to the Texas retail liquor

market. Consequently, the market is overwhelmingly served by in-state firms. Unlike in *Exxon* and *Allstate*, the challenged statutes do not simply bar a few particular interstate companies from entering the Texas retail liquor market; rather, they bar nearly all potential out-of-state entrants, affecting the interstate market as a whole. *See Exxon*, 437 at 117 (stating that the dormant Commerce Clause "protects the interstate market, not particular interstate firms"). But ultimately, the Court is not satisfied that this distinction, one only of degree, provides an adequate basis to depart from *Exxon*, *Ford*, and *Allstate*'s counsel.

79. The Court concludes that *Exxon*, *Ford*, and *Allstate* preclude a finding of discriminatory effect. Those cases instruct that a law does not discriminate in effect unless the law differentiates between similarly situated in-state and out-of-state companies on the basis of the companies' ties to the state. The public corporation ban does not. Public corporations are banned from the market whether or not they are based in Texas or owned by Texans. Similarly, corporations with fewer than thirty-five shareholder are allowed to sell liquor in the state whether or not they are based in Texas or owned by Texans. The record indicates some Texas companies are blocked from selling liquor in the state, and, conversely, at least one significant out-of-state company has successfully entered the Texas market. Thus, the Court finds that while the public corporation ban was enacted with discriminatory purpose, it does not have a discriminatory effect as defined by controlling precedent.[4]

---

[4] The Court recognizes that this result—finding that the law intentionally discriminates (or at least attempts to discriminate) against out-of-state businesses but does not produce the effect intended—may seem bizarre. However, the record demonstrates that it was the Legislature's intent to discriminate, but Wal-Mart has not made the requisite showing that the public corporation ban "has the effect of providing a competitive advantage to in-state interests vis-a-vis similarly situated out-of-state interests." *Ford*, 264 F.3d at 501.

## C.    The Public Corporation Ban Fails *Pike* Balancing

80.    A law that does not directly discriminate against interstate commerce may still offend the dormant Commerce Clause if it fails the *Pike* balancing test.[5] *Pike* provides a standard for assessing state laws that regulate "even-handedly" but nonetheless impose "incidental" burdens on interstate commerce. *Pike*, 397 U.S. at 142; *see also Wyoming v. Oklahoma*, 502 U.S. 437, 455 & n.12 (1992) (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 579 (1986)) (explaining that "a less strict scrutiny is appropriate" when a law "has only indirect effects on interstate commerce").

81.    The *Pike* balancing test has three steps. First, a court must determine whether the challenged regulation incidentally burdens interstate commerce. *Pike*, 397 U.S. at 142. Second, a court asks whether the regulation has "putative local benefits." *Id.* Finally, the court must weigh the

---

[5] The *Pike* balancing test applies to the regulation of alcoholic beverages. TABC cites a concurring opinion from the Seventh Circuit to suggest that the *Pike* inquiry may not be applicable to cases involving alcoholic beverages due to the Twenty-first Amendment's conferral of the authority to regulate the alcohol industry to the states. *See Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 467 (7th Cir. 2012) (Hamilton, J., concurring) ("In my view of the applicable law, the Twenty-first Amendment to the Constitution should foreclose those balancing tests when the state is exercising its core . . . power to regulate the transportation and importation of alcoholic beverages for consumption in the state."). However, the Supreme Court has rejected the argument that the Twenty-first Amendment forecloses dormant Commerce Clause challenges to state regulations of the alcohol industry. *Granholm v. Heald*, 544 U.S. 460, 484–85 (2005) ("The aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor . . . . The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time."); *see also Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989). Moreover, the Supreme Court has repeatedly cited *Pike* in dormant Commerce Clause cases involving alcoholic beverages. *Brown-Forman Distillers*, 476 U.S. at 579; *Bacchus Imports*, 468 U.S. at 270. And numerous federal courts of appeals have applied *Pike* in cases involving alcohol. *Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008); *Wine & Spirits Retailers, Inc.*, 481 F.3d at 15; *see also Lebamoff Enters.*, 666 F.3d at 460 (compiling cases). In the case cited by TABC, the majority opinions rejects the contention that *Pike* does not apply to alcohol cases on the basis that not a single federal appellate court has so held. *Lebamoff Enters.*, 666 F.3d at 460 (internal citations omitted) ("Our *Baude* decision analyzed Indiana's alcohol laws under *Pike*'s balancing test and invalidated one of them, and other courts have analyzed similar laws similarly. . . . [W]e find none that rejects that approach."). Thus, absent any controlling authority expressly exempting the regulation of alcoholic beverages from *Pike*'s ambit, the Court is compelled to apply the *Pike* balancing test here.

local benefits of the regulation against the burdens the regulation places on interstate commerce. *Id.* A law reviewed under *Pike* balancing "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

82. There is no clear standard for determining whether a law incidentally burdens interstate commerce. *See Churchill Downs*, 589 F. App'x at 235 ("We note that the jurisprudence in the area of the dormant Commerce Clause is, quite simply, a mess. It has failed to produce a readily discernible standard for distinguishing between statutes that have discriminatory effects and those that merely create incidental burdens."); *see also Wyoming*, 502 U.S. at 455 n.12 (quoting *Brown-Forman Distillers*, 476 U.S. at 579) ("[T]here is no 'clear line' separating close cases on which scrutiny should apply."). The Fifth Circuit has stated that "[a] statute imposes a burden when it inhibits the flow of goods interstate." *Allstate*, 495 F.3d at 163 (citing *Ford*, 264 F.3d at 503). Elsewhere, the Fifth Circuit has stated that *Pike* balancing applies to laws that have a "disparate impact on interstate commerce," defined as placing "burdens on interstate commerce that exceed the burdens on intrastate commerce." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 501 (5th Cir. 2004) (quoting *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys. Inc.*, 155 F.3d 59, 75 (2d Cir. 1998)).

83. Here, the public corporation ban places a substantial burden on interstate commerce by protecting Texas-owned package stores at the expense of potential out-of-state entrants. Because of the ban, the overwhelming majority (around 98%) of Texas package stores and Texas package store companies are wholly Texas owned. *Supra* Section VII. Moreover, the credible evidence indicates that in the absence of the ban, the Texas retail liquor market would likely be served by numerous out-of-state companies. *Id.* Texas's retail beer and wine market (where the challenged statutes do not apply) is an instructive comparator. In that related market, out-of-state companies serve a significant share of the market. *Id.* Accordingly, the Court concludes that the public

corporation ban acts to block the vast majority of potential out-of-state entrants from the Texas market, while leaving undisturbed most potential in-state entrants. Thus, the Court finds the public corporation ban has a "disparate impact" on out-of-state companies and *Pike* balancing applies. *Nat'l Solid Waste Mgmt.*, 389 F.3d at 501.

84.     TABC and TPSA insist that the burden the public corporation ban places on out-of-state companies is not disproportionate to the burden it places on in-state companies. TABC and TPSA submit evidence they believe shows the share of companies barred by the law that are based in Texas is roughly proportional to Texas's share of the national population and national economy. To illustrate, TPSA's expert argued that, by his calculation, 19% of potential entrants barred by the public corporation ban are based in Texas, whereas Texas is home to roughly 8% of the population and roughly 10% of the top national retailers. *See* TABC Ex-48. From this perspective, the public corporation ban appears to treat in-state and out-of-state companies equally, or at best, disproportionately harm in-state companies. While appealing at first glance, the Court disagrees with this understanding of what it means for a state regulation to disproportionately affect interstate commerce.

85.     TABC and TPSA's analysis errs by using the wrong denominator.[6] Their approach compares the makeup of the market created by the challenged statutes to the makeup of the national

_____

[6] The parties' disagreement as to the appropriate denominator and its import is best illustrated by example. Consider a single state that accounts for 10% of the nation's economy. Unregulated, the state's market for a product is served by 50 in-state companies and 10 out-of-state companies. The state introduces a law that bars from the local market 1 in-state company and 9 out-of-state companies. Of all the companies blocked by the new law, 10% are in-state companies, whereas 90% are out-of-state companies. From one perspective, the law does not have a disproportionate effect on interstate commerce, because 10% of the companies that are blocked by the law are in-state companies, a figure which is comparable to the state's 10% share of the economy. On the other hand, of all the in-state companies that originally served the market, only 2% are blocked by the new law; whereas, of all the out-of-state companies that originally served the market, 90% are blocked by the new law. Consequently, the share of the market held by in-state companies increases as a result of the law from 83% to 98%. Thus, from another perspective, the new law has a severely

economy. Yet, even absent the challenged statutes, the Texas retail liquor market would not be a perfect microcosm of the national economy. Unregulated, that market would probably have many more Texas-owned and Texas-based package stores than California-owned and California-based package stores, even though California has a larger population and a larger economy than Texas. This is because only out-of-state companies with the requisite capital and scale are capable of entering the Texas market. *See* supra Sections VII & VIII. If the challenged statutes are lifted, a mom-and-pop package store in Bentonville, Arkansas is unlikely to open a second location in Austin, Texas. Wal-Mart, however, might.

86.     The proper comparison is to what the market would look like if the challenged statutes were not in place. In other words, assessing disparate impact requires the Court to measure the effect the public corporation ban has on the in-state and out-of-state companies that would otherwise serve the market if not for the ban. This is the analysis typically employed to measure discriminatory effect when courts compare what a market looks like before and after a challenged law goes into effect. Here, the analysis is complicated by the fact that, prior to the enactment of the public corporation ban, an unconstitutional residency requirement was in effect. This means that the status quo ex ante cannot be used as proxy for what the retail liquor market would look like without the challenged statutes. But the basic principle holds true: whether a statute burdens interstate commerce is assessed by comparing the role of out-of-state companies in the market with and without the challenged law. Applying this principle, the Court readily concludes that the public corporation ban has a disparate impact on interstate commerce because it disproportionately blocks out-of-state companies form selling liquor in Texas.

---

disproportionate effect on interstate commerce. The reason that the two approaches yield such different results is that the makeup of the unregulated local market bears no resemblance to the makeup of the national economy.

87.     Having resolved the threshold inquiry of whether the public corporation ban places a burden on interstate commerce, the Court now turns to the next step of the *Pike* inquiry, which requires consideration of whether a state regulation has "a legitimate local purpose" by assessing its "putative local benefits." *Pike*, 397 U.S. at 142. This inquiry requires deference to the state legislature. *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 92 (quoting *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 678 (1981) (Brennan, J., concurring in judgment)) ("The Constitution does not require the States to subscribe to any particular economic theory. We are not inclined 'to second-guess the empirical judgments of lawmakers concerning the utility of legislation.'"). Accordingly, *Pike*'s second step imposes something akin to a rational basis inquiry. *See Int'l Truck & Engine Corp.*, 372 F.3d at 728 (5th Cir. 2004) (quoting *Ford Motor Co.*, 264 F.3d at 504 ("[W]e credit a putative local benefit 'so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes.'").

88.     In assessing Wal-Mart's equal protection claim, the Court has subjected the public corporation ban to a rational basis inquiry. *See* infra Section XI.A. In doing so, the Court concludes that the public corporation ban is rationally related to a legitimate state interest. Most pertinently, the Court finds that there is a conceivable relationship between the public corporation ban and the state's legitimate interest in reducing the availability and consumption of liquor. Because the statute is not wholly irrational, the Court is required to credit it as having some putative local benefits and a legitimate local purpose. Finding a legitimate local purpose advances but does not resolve the *Pike* inquiry.

89.     The final step under *Pike* is to weigh the challenged statute's putative local benefits against the burden the statute imposes on interstate commerce: "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved." *Pike*, 397 U.S. at 142. It also

depends on whether the local interests served by the regulation "could be promoted as well with a lesser impact on interstate activities." *Id.*; *see also Nat'l Solid Waste Mgmt.*, 389 F.3d at 501 (5th Cir. 2004) (holding that *Pike* compels consideration of "the nature of the local interest and whether alternative means could achieve that interest with less impact on interstate commerce").

90.     In applying this balancing test, the Court first notes that the burdens the public corporation ban imposes on interstate commerce are substantial. As has been explained, the law has been enacted and maintained with the express goal of maintaining a business climate created by a facially discriminatory and unconstitutional residency requirement. The statutes have had this effect: the vast majority of potential out-of-state entrants are excluded from the retail Texas liquor market, and that market is consequently almost exclusively served by in-state retailers. *See* supra Section VII.

91.     Next, the Court finds that however substantial the state's interest in reducing the availability and consumption of liquor may be, the weight of the evidence demonstrates that this interest can be achieved through alternative means with less impact on interstate commerce. On this point, there is hardly any dispute. The record consistently indicates that any effects the public corporation ban has on the price, availability, or consumption of liquor could be more easily and more directly achieved through other regulatory measures, including the imposition of excise taxes (that raise the price of liquor) or the use of manner-of-sales regulations (that control where and how liquor can be sold). *See* supra Section VIII. The available evidence suggests that excise taxes are the most common and most efficacious policy tool for minimizing externalities associated with liquor consumption. *Id.* In fact, all five experts testified at trial that excise taxes are an effective method of discouraging the consumption of liquor. *Id.* Indeed, TPSA concedes that a variety of "direct controls" are available to Texas to reduce liquor consumption (including, for example, "quotas or hard permit caps"), and that among the available options, "a proven method of reducing consumption is to increase excise taxes." TPSA Trial Br., Dkt. 314, at 18. Thus, the record leaves

little room to doubt that if Texas desired to manage the price, availability, and consumption of liquor without burdening interstate commerce, it could easily do so. And *Pike* compels the Court to account for the availability of these alternative measures in weighing the benefits and burdens of the challenged statutes.

92.     In balancing these equities, the Fourth Circuit's holding in *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.* is instructive. 401 F.3d 560 (4th Cir. 2005). In that the case, the court considered a Virginia statute that allowed existing motorcycle dealerships to protest and block (or at least substantially delay) the opening of new dealership franchises anywhere in the state. The court acknowledged that the Virginia law "is neutral on its face" as it "makes no distinction between in-state and out-of-state manufacturers," and found "no evidence" that the law "would have any probable or discernible discriminatory effects on interstate commerce." *Id.* at 567–569. Accordingly, the court concluded that the law "does not discriminate against interstate commerce." *Id.* at 569.

93.     The court then applied *Pike* balancing. In doing so, it held that the law "has a legitimate general purpose: to protect existing motorcycle dealers in Virginia from unfair practices by manufacturers" and, accordingly, would survive rational basis review. *Id.* at 568. On the other hand, the court reasoned that the law is "uniquely anti-competitive" because it creates "a significant barrier to market entry." *Id.* at 571. Critically, it found that any local benefits of the law "could have been achieved with a less restrictive alternative," specifically by affording protest rights only to dealerships within a limited radius of a new dealership's location. *Id.* at 573. The Fourth Circuit concluded that in light of the law's "unnecessary and excessive breadth," its "burdens clearly exceed its benefits." *Id.*

94.     Here, as in *Yamaha*, the challenged statutes serve a legitimate local purpose. But the public corporation ban is also "uniquely anti-competitive," creates "a significant barrier to market entry," and, thus, imposes a "severe" burden on interstate commerce. *Id.* at 571. Notably, the burden imposed by the ban is more onerous than the burden imposed by the dealership law at issue in

*Yamaha*; the public corporation ban outright blocks from the market the vast majority of potential out-of-state entrants. In *Yamaha*, the challenged law imposed only a limited and surmountable obstacle to market entry. *See id.* (noting that potential market entrants "are forced to play a waiting game that could take years"). Moreover, like in *Yamaha*, whatever benefits the public corporation ban may have can be achieved using alternative, more narrowly tailored regulatory tools. *See id.* at 569 ("A statute need not be perfectly tailored to survive *Pike* balancing, but it must be reasonably tailored."). Ultimately, the Court concludes that if it were to uphold the protectionist scheme created by the ban and allow Texas to bar the vast majority of potential out-of-state entrants into the Texas liquor market "it would jeopardize what the dormant Commerce Clause aims to preserve: 'a national [free] market for competition undisturbed by preferential advantages conferred by [individual states] upon [their] residents or resident competitors." *Id.* at 573–74 (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997)) (modifications in original).

95.     In sum, the public corporation ban imposes a severe burden on interstate commerce. While the statute has some putative benefits, those benefits can be easily and more directly achieved through a variety of alternative regulatory measures. Accordingly, the Court concludes that burdens the ban places on interstate commerce are clearly excessive relative to its local benefits. Thus, the challenged statutes fail the *Pike* balancing test.

### D.     The Five-Permit Limit and the Consanguinity Exception Do Not Offend the Dormant Commerce Clause

96.     Wal-Mart also argues that the five-permit limit independently offends the dormant Commerce Clause. The Court disagrees.

97.     First, there is insufficient evidence to find that the five-permit limit and consanguinity exception were enacted with discriminatory purpose. The only evidence in the record indicating that these statutes were enacted with discriminatory purpose arises out of recent repeal

efforts. *See* supra Section VI. There is no evidence in the record suggesting the Legislature acted with discriminatory purpose at the time these laws were enacted. There is no evidence the "historical background" of the laws or the "specific sequence of events leading up" to the laws' passage suggests discriminatory purpose. *Allstate*, 495 F.3d at 160 (citing *Arlington Heights*, 429 U.S. at 266–68). There is also no evidence of "contemporary statements by decisionmakers" indicating discriminatory purpose. *Id.* (citing *Arlington Heights*, 429 U.S. at 266–68). While circumstantial evidence of discriminatory purpose emanating from subsequent repeal efforts may be helpful in ascertaining the Legislature's intent, alone it is insufficient to satisfy Wal-Mart's burden of demonstrating discriminatory purpose. *See id.* (citing *Hughes v. Oklahoma*, 441 U.S. 322 (1979)) ("The burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party challenging the provision.").

98. Second, the five-permit limit and the consanguinity exception do not have a discriminatory effect for the same reasons as the public corporation ban. *See* supra Section X.B. The consanguinity exception, like the public corporation ban, discriminates against companies with diffuse ownership. It is possible that this classification disproportionately affects out-of-state companies. However, the consanguinity exception does not expressly differentiate between similarly situated companies and does not have the practical effect of discriminating against out-of-state companies based on their contacts with the Texas. It thus does not have a discriminatory effect. *Exxon*, 437 U.S. at 127; *Allstate*, 495 F.3d at 163; *Ford*, 264 F.3d at 501.

99. Third, there is inadequate evidence to find that the five-permit limit and consanguinity exception burden interstate commerce. The record indicates that the cumulative effect of the challenged statutes is to disproportionately block out-of-state companies from entering the Texas retail liquor market. However, all of the available evidence explaining how the statutes achieve this effect focuses on the role of the public corporation ban. *See* supra Section VII. Given that both

statutes discriminate on the basis of a company's ownership structure, there is a basis to infer that the consanguinity exception likely has a similar effect as the public corporation ban. But, there is no specific evidence in the record demonstrating that the consanguinity exception disproportionately excludes out-of-state companies. Thus, the Court declines to apply *Pike* balancing to these statutes. However, the Court notes that even if the Court were to review the five-permit limit and consanguinity exception under *Pike* balancing, the inquiry would be similar to the rational basis inquiry, which the Court conducts below. *See Int'l Truck & Engine*, 372 F.3d at 728 (explaining that under *Pike* a court credits a regulation's putative benefits as long as the "regulation is not wholly irrational in light of its purposes.'").

## XI. Equal Protection Clause

100.    The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Wal-Mart argues that the challenged statutes compel differential treatment of similarly situated entities and thus violate this constitutional guarantee of equal treatment. *See Mahone v. Addicks Util. Dist. of Harris Cty.*, 836 F.2d 921, 932 (5th Cir. 1988) ("The equal protection clause essentially requires that all persons similarly situated be treated alike."). Because Wal-Mart is not a member of a protected class, and the challenged statutes do not infringe upon fundamental constitutional rights, the Court applies rational basis review.[7] *Hines v. Alldredge*, 783 F.3d, 202–03 (5th Cir. 2015).

_____

[7] Wal-Mart argues that the public corporation ban ought to be assessed using heightened scrutiny because it was enacted with animus toward public corporations generally and animus toward Wal-Mart in particular. In support, Wal-Mart cites a single case involving same-sex marriage. *See Bishop v. Smith*, 760 F.3d 1070, 1099–1100 (10th Cir. 2014) (Holmes, J., concurring) (discussing a line of cases where upon a finding of animus courts have applied a more rigorous variant of the rational basis inquiry). All of the cases compiled in the *Bishop* concurrence cited by Wal-Mart involve animus toward *people*. Wal-Mart does not cite any case where heightened scrutiny has been applied on the basis of animus toward a corporation or some species of corporations. This Court declines to

101.     To survive rational basis review, a law must be "rationally related" to "a legitimate

state purpose." *Mahone*, 836 F.2d at 932. To determine whether a law is rationally related to its

purpose, courts asses the "fit" between the classification the law imposes and the ends the law

serves. *Id.* The determinative question is "whether the state could rationally determine that by

distinguishing among persons as it has, the state could accomplish its legitimate purpose." *Id.* Put

differently, a law survives rational basis review "if there is any reasonably conceivable state of facts

that could provide a rational basis for the classification." *Madris-Alvarado v. Ashcroft*, 383 F.3d 321,

332 (5th Cir. 2004) (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)); *see also Romer v. Evans*,

517 U.S. 620. 631 (1996) (holding that a law survives rational basis review "so long as it bears a

rational relation to some legitimate end").

102.     Rational basis review is a highly deferential inquiry, but it is nonetheless a fact-

intensive one. The Fifth Circuit's opinion in *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013),

is instructive. In *St. Joseph Abbey,* the court struck down a Louisiana law requiring that caskets be sold

only by licensed funeral directors at licensed funeral homes. *Id.* The Fifth Circuit explained that

"although rational basis review places no affirmative evidentiary burden on the government,

plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of

irrationality." *Id.* at 223. The court counseled that under rational basis review the examination of the

fit between a law and its purported purposes should not proceed in abstraction but rather should be

"informed by the setting and history of the challenged rule." *Id.* The *St. Joseph Abbey* panel framed

---

become the first. Wal-Mart also argues that the consanguinity exception should be assessed under
heightened scrutiny because it discriminates on the basis of family status. *See, e.g., Cox v. Schweiker*,
684 F.2d 310, 320 (5th Cir. 1982) (applying "a standard of review that is more exacting than a
rational relations test" to a case involving discriminatory treatment of illegitimate children). Here, the
Court is somewhat more sympathetic. But because the consanguinity exception fails even rational
basis review, the Court need not decide whether a more exacting standard is appropriate.

"the pivotal inquiry" as "whether there is a rational basis . . . that can . . . be articulated and is not plainly refuted by the [plaintiffs] on the record compiled by the district court at trial." *Id.*

103.     Wal-Mart argues that, at trial, it plainly refuted the contention that the challenged statutes serve any legitimate purpose. With regard to the public corporation ban, the five-permit limit, and the prohibition on BQ permittees holding P permits, the Court disagrees. These statutes are all conceivably related the state's legitimate purpose reducing the availability and consumption of liquor. Accordingly, these statutes survive rational basis review.

104.     However, the Court concludes that the consanguinity exception to the five-permit limit imposes an arbitrary classification that is not rationally related to any legitimate state purpose. This statute thus fails rational basis review. Moreover, when a classification is deemed unconstitutional, lower courts are instructed to craft a remedy that expands rather than restricts access to the rights or benefits at issue. Thus, the appropriate remedy here is to enjoin enforcement of both the underlying the five-permit limit and its constitutionally infirm exception.

A.     The Public Corporation Ban Survives Rational Basis Review

105.     The Court begins with the public corporation ban. TABC and TPSA contend that the state's decision to prohibit public corporations from selling liquor at retail serves a number of purposes. Primarily, they argue that the ban reduces the consumption of liquor by increasing prices and limiting the density of retail liquor outlets. It is undisputed that the state has a legitimate interest in moderating the consumption of liquor and minimizing liquor-related externalities. For the reasons that follow, the Court concludes that there is a conceivable relationship between prohibiting public corporations from retailing liquor and the state's legitimate interest in discouraging the consumption of liquor. Because the state's interest in moderating the consumption of liquor provides the public corporation ban adequate support to survive rational basis review, the Court need not address the other proffered rationales (which include promoting small businesses and corporate accountability).

106.     There is a conceivable relationship between the public corporation ban and the state's legitimate purpose of moderating the consumption of liquor and reducing liquor-related externalities. The state could reasonably believe that excluding public corporations from the market would artificially inflate liquor prices (and thus reduce consumption) for at least two reasons.

107.     First, the state could reasonably believe that excluding public corporations would reduce the total number of firms participating in the market, shift the supply curve, and, as a matter of economic principle, drive up prices. *See supra* Section VIII. Wal-Mart insists that the market, even without the participation of public corporations, has reached competitive equilibrium and thus argues that allowing public corporations to enter the market would have no effect on price. Even assuming Wal-Mart is correct on this point, it simply shows that Texas misjudged the competitiveness of the liquor market. Wal-Mart's burden is to show that there is no reasonably conceivable state of facts that might provide a basis for the law. The record indicates it is reasonable for the state to believe that excluding a large number of suppliers from the market might inflate prices.

108.     Second, the state could reasonably believe that public corporations have the necessary scale and capital to offer aggressive discounts. *See supra* Section VIII. Wal-Mart argues that Texas's three-tier system prevents even extremely large companies from exerting any scale advantage. Again, this proves too little. White it may be the case that elements of the three-tier system mitigate the ability of large companies to use scale to their advantage, this simply shows that the putative benefits of the ban are unlikely to fully materialize. It does not show that the state's proffered basis for the law lacks any rational basis. To the contrary, the record indicates that there is reasonable basis for Texas to conclude that public corporations are likely to be larger and better-resourced, and that these sorts of companies are, at least plausibly, more likely to offer competitive discounts. *Id.*

109.     Notably, Wal-Mart's contention that there is no rational basis to believe that the public corporation ban inflates liquor prices is undercut by its own repeated assertions to the contrary. In an internal document spelling out "Key Messages" with regard to this litigation and related lobbying efforts, Wal-Mart stated, "The current law's ban on public corporations selling spirits . . . serves to prevent competition and limit choice and convenience, as well as keep the price of spirits artificially high, all of which harm Texas consumers." TABC EX-40. In its complaint in this very lawsuit, Wal-Mart alleges, "[T]he ban against public corporations negatively impacts Texas consumers, who are forced to pay non-competitive prices because fair competition is prevented." Orig. Compl. Dkt. 1, ¶ 28.

110.     Wal-Mart responds that even if there is a reasonable basis to believe that the public corporation ban will indirectly inflate liquor prices, the classification is still too attenuated and arbitrary to survive rational basis review. To the extent the ban drives up prices—the argument goes—it does so simply by excluding a subset of retailers from the market and thus reducing aggregate supply. Wal-Mart argues that the same effect might be achieved by excluding companies whose owners have blond hair or were born on an odd-numbered day or by some other totally arbitrary classification. Yet, here the classification is not totally arbitrary. The record indicates that Texas could reasonably believe public corporations tend to be larger and better resourced than their closely-held competitors. So, the state could conceivably predict that, because of their scale, excluding public corporations would have a larger effect on prices than excluding some other subset of retailers. *See* supra Section VIII.

111.     The Court notes that, in the context of its dormant Commerce Clause claim, Wal-Mart has (persuasively) argued that public corporations are precisely those companies that are likely to have the scale and resources to enter the Texas market from out of state. Wal-Mart cannot have it both ways. It cannot both be the case that the public corporation classification is entirely arbitrary

and yet, at the same time, an effective proxy for the subset of companies that have the resources to compete across state lines.

112.     In sum, Texas could reasonably believe that excluding public corporations from the retail liquor market would artificially inflate prices, thereby moderating the consumption of liquor and reducing liquor-related externalities. Wal-Mart has adduced evidence that casts doubt on whether the law will have this effect. But Wal-Mart has not proven that the state's theory that excluding large, well-resourced companies from the market might drive up prices is pure "fantasy." *St. Joseph Abbey*, 712 F.3d at 223. Thus, the public corporation ban, while constitutionally infirm under the dormant Commerce Clause, does not offend the Equal Protection Clause.

### B.     Section 22.06(a)(2) Survives Rational Basis Review

113.     Next, the Court turns to section 22.06(a)(2), which prohibits the holder of a wine and beer retailer's off-premise permit, known as a BQ permit, from also holding a package store permit. Most grocery stores in the state hold BQ permits, which allow them to sell both beer and wine. Wal-Mart's existing retail stores in the state all hold BQ permits. Accordingly, before Wal-Mart could obtain any package store permits, it would be required to convert its BQ permits into separate BF licenses (for beer) and Q permits (for wine). The rights conferred by the BQ permit are nearly identical to the rights conferred by the combination of the BF and Q permits, with a few minor differences. (The most relevant distinction is that a Q permittee may sell wine with up to 24% alcohol content, whereas a BQ permittee may only sell wine with up to 17% alcoholic content.) Wal-Mart contends that the process of converting its permits would require significant time and expense. In addition to being burdensome, Wal-Mart believes that this restriction is arbitrary. It thus argues that the restriction fails rational basis review because it differentiates between entities that hold BQ permits and those that do not, without basis. The Court disagrees for two reasons.

114.     First, section 22.06(a)(2) does not impose a classification cognizable under the Equal Protection Clause. "Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Mahone*, 836 F.2d at 932. Here, section 22.06(a)(2) treats all entities the same: they may elect to obtain a BQ permit or not. Any entity that chooses to obtain a BQ permit is not allowed to obtain a package store permit. Wal-Mart contends that the law discriminates against the holders of BQ permits, while favoring entities that do not hold BQ permits. Yet, the beneficiaries of this purportedly preferential scheme (entities that do not hold BQ permits) are treated no differently than Wal-Mart or other BQ permittees—they have simply made a different decision. The law itself applies to all parties equally.

115.     Second, section 22.06 is rationally related to limiting the number of retail liquor outlets and moderating liquor consumption. The law forces retailers to choose between the privileges of selling less potent alcoholic beverages using a single streamlined BQ permit or, if it wants to sell more potent beverages, to endure the time and expense of obtaining more permits at a higher cost and to be subject to more regulatory strictures. Wal-Mart's objection that converting its BQ permits into BF licenses and Q permits will be a costly process simply underscores that section 22.06 effectively discourages retailers (particularly those already selling beer and wine) from entering the package store market. Thus, there is a conceivable relationship between section 22.06 and the state's legitimate interest in reducing the number of retailers in the liquor market and reducing the number of retail liquor outlets. The Court is not persuaded that there is no rational basis for Texas's decision to prevent BQ permittees from procuring package store permits.

### C. The Five-Permit Limit Survives Rational Basis Review

116.     The Court next turns to the five-permit limit, which (subject to the consanguinity exception discussed below) prohibits any entity from holding an interest ("in" or "in an entity holding") more than five package store permits. The five-permit limit is rationally related to the state's legitimate interest in limiting the number and density of retail liquor outlets in order to reduce the availability and increase the price of liquor. Numerous states impose similar permit limits, *see* TABC Ex-67, and these limits have been repeatedly upheld by other courts, *e.g.*, *Parks v. Allen*, 426 F.2d 610, 614 (5th Cir. 1970) (upholding an Atlanta ordinance that prohibited issuance of more than two liquor licenses to single family); *McCurry v. Alcoholic Bev. Control Div.*, 4 F. Supp. 3d 1043, 1047 (E.D. Ark. 2014) (upholding Arkansas's one-permit limit). The five-permit limit, standing alone, survives rational basis review.

### D. The Consanguinity Exception Fails Rational Basis Review

117.     Finally, the Court turns to the consanguinity exception to the five-permit limit. Tex. Alco. Bev. Code. § 22.05. Under this statute, two family members within the first degree of consanguinity that each have a majority interest in an entity that holds package store permits may consolidate their package store businesses into a single legal entity. The new, consolidated entity may retain all of the package store permits, notwithstanding the five-permit limit. There is no limit to the number of times that a permittee may use the same relative to obtain and consolidate additional permits. A single consolidating relative is enough to enable a business to obtain an unlimited number of permits. Texas's largest package store companies all have substantially more than five permits because of the consanguinity exception.

118.     This consolidation process, however, is not available to everyone. To be eligible for consolidation, both family members must have a majority interest in their respective entities. No single person owns a majority interest in Wal-Mart, meaning Wal-Mart, if it were allowed to hold

package store permits, would be limited to five permits. The same is true for many companies with diffuse ownership. Other companies may not have access to the consolidation process not because they lack a single majority interest holder, but because their majority interest holder lacks a child, sibling or parent who is willing to assist with the consolidation process.

119.    It is helpful to begin the rational basis inquiry by identifying the legal classification at issue. Here, the consanguinity exception differentiates between companies that are majority owned by a single natural person who has a family member within the first degree of consanguinity who is willing and able to assist in the consolidation process and companies that do not. Wal-Mart argues that there is no rational basis for such an unusual classification. The Court agrees.

120.    TABC offers a variety of rationales in support of the consanguinity exception, including that it: (1) promotes family businesses, (2) promotes small businesses, (3) enables estate planning, and (4) creates an opportunity for package stores to grow in certain areas, such as large cities. None of these rationales is persuasive.

121.    First, there is no rational relationship between the consanguinity exception and promoting family businesses. Assuming that promoting family-owned or family-managed businesses is a legitimate state interest, the consanguinity exception does the exact opposite. To begin with, the statute does not favor family owned businesses; it favors businesses that are owned by people with certain types of family members. For example, a package store company wholly owned by a single person whose family members have no involvement in the company whatsoever (either as owners, managers or employees) may still use the consanguinity exception to obtain more than five permits as long as the owner has a single child, sibling, or parent who is willing to complete the necessary consolidation paperwork. Yet, such a company—wholly owned by a single person—is surely not a family business.

122.     More to the point, under the consanguinity exception, the consolidating relative may not be employed by the current permittee or have any ownership in the permittee's business. The five-permit limit prohibits any person from "directly or indirectly" having an interest in more than five permits, and a company's "stockholders, managers, officers, agents, servants, and employees" are all considered to have an interest in the company's permits. Tex. Alco. Bev. Code. § 22.05. Exceeding the five-permit limit therefore requires a family member with no involvement in the package store company who can independently obtain more permits and then consolidate them into the existing business. The law thus *discourages* family members from becoming involved in the business, because by doing so a family member would disqualify herself from obtaining and consolidating more permits. Unsurprisingly, there is not a scintilla of evidence in the record suggesting that the consanguinity exception has had any effect on the number of package store companies that are "family businesses," however that term may be defined.

123.     Second, there is no rational relationship between the consanguinity exception and promoting small businesses. The five-permit limit promotes small businesses by restricting the number of permits any company may hold and thus placing a ceiling on the growth of any one package store company. The consanguinity exception does the exact opposite: it exempts some companies from the five-permit limit, allowing them to circumvent the ceiling that the limit imposes. The exception creates an opportunity for a limited class of businesses to avoid the five-permit limit and thus promotes the growth of large package store chains. If it were not for the consanguinity exception, no package store company in the state would own more than five package stores. Yet, because of the exception, Texas has several large package store chains, one of which owns over 150 package stores. *See* supra Section IV.

124.     Third, there is no rational relationship between the consanguinity exception and estate planning. TABC suggests that the exception provides a succession mechanism that is

somehow helpful in estate planning. Yet, it is entirely unclear how this consolidation procedure aids the process of estate planning. As with any other type of business, there are many tools available to a package store owner who wants to ensure her business assets are appropriately transferred after her death. Even if some form of consolidation procedure may serve estate planning purposes, TABC does not even attempt to explain why allowing a consolidated entity to avoid the five-permit limit has any relationship to estate planning. Moreover, assuming the consanguinity exception is somehow helpful in the estate planning process, TABC does not explain why it should be limited to such a narrow class of package store permit holders. The owners of package store companies that do not have a child, sibling or parent who is able to assist in the consolidation process also have estates that require resolution. In the Court's view, this rationale borders on nonsensical and cannot save the consanguinity exception from constitutional scrutiny.

125.    Fourth, there is no rational relationship between the consanguinity exception and allowing for package store companies to grow in targeted areas. There is nothing in the law that limits package store companies that utilize the consolidation process to opening new stores in areas where growth is needed. Companies which use the consolidation procedure can and do open new package stores wherever they please. If Texas believes the five-permit limit is overly restrictive, it is free to raise it. Similarly, if Texas believes there are certain underserved areas in need of more retail liquor outlets, it is, of course, free to create a tailored exception. But the notion that the consanguinity exception—as blunt and arbitrary as it is—somehow serves a targeted growth strategy simply beggars belief.

126.    In sum, the consanguinity exception creates an unusual and entirely arbitrary classification. There is no reason to believe that the exception bears any relation to the promotion of family business or small business or serves any other legitimate state interest. It thus fails rational basis review.

127.     Having resolved that the consanguinity exception fails rational basis review, the

question remains what relief is warranted. The Fifth Circuit instructs,

> When a statute conferring benefits on a certain class of persons is held
> unconstitutional due to violation of the equal protection clause, then the unlawful
> discrimination must be eradicated, either by granting the benefits to the
> inappropriately excluded class, or by denying them to the class theretofore benefitted
> unlawfully. In such cases where a sovereign has intentionally conferred some type of
> benefit upon one group and thereby unconstitutionally deprived another, the normal
> judicial remedy is to extend the benefits to the deprived group. Otherwise the result
> is an imposition of hardship on a number of persons whom the legislature intended
> to protect.

*Cox v. Schweiker*, 684 F.2d 310, 317 (5th Cir. 1982) (internal citations omitted) (citing *Califano v.

Westcott*, 443 U.S. 76 (1979)); *Welsh v. United States*, 398 U.S. 333 (1970); *see also Califano*, 443 U.S. at 89

(quoting *Welsh*, 398 U.S. at 361) (holding that "[w]here a statute is defective because of

underinclusion," the appropriate remedy is "extension rather than exclusion").

128.     The consanguinity exception is unconstitutional because it extends a benefit (the

right to have more than five package store permits) to some persons while withholding it from

others without a rational basis. In light of the above-stated law, the appropriate remedy is to "extend

the coverage of the statute to include those who are aggrieved by the exclusion." *Califano*, 443 U.S. at

89. Here, that means allowing all persons to hold more than five package store permits. This result is

achieved by enjoining enforcement of both the consanguinity exception and the five-permit limit to

which it applies.

## RELIEF

129.     For the foregoing reasons, the Court concludes and hereby **DECLARES** that: (1)

Section 22.16 of the Texas Alcoholic Beverage Code, the public corporation ban, is inconsistent

with the dormant Commerce Clause of the United States Constitution, and (2) Section 22.05 of the

Texas Alcoholic Beverage Code, the consanguinity exception, is inconsistent with the Equal

Protection Clause of the United States Constitution.

130.     Defendants in this action are hereby permanently **ENJOINED** from enforcing Section 22.16 of the Texas Alcoholic Beverage Code.

131.     Defendants in this action are hereby permanently **ENJOINED** from enforcing Section 22.04 of the Texas Alcoholic Beverage Code.

132.     Defendants in this action are hereby permanently **ENJOINED** from enforcing Section 22.05 of the Texas Alcoholic Beverage Code.

133.     This order and all relief granted herein are hereby provisionally **STAYED** for a period of sixty days. Any party intending to seek a stay for the duration of a forthcoming appeal shall so move the Court within ten days of the date of this order.

134.     Finally, the Court concludes it is appropriate to defer consideration of whether Plaintiffs are entitled to reasonable attorneys' fees and costs until after the resolution of any appeals. Accordingly, the Court will consider a motion for reasonable attorneys' fees and costs only after all appeals have been fully and finally resolved.

**SIGNED** on March 20, 2018.


_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE